Ritrovato *v.* Ritrovato, Appellant.

Argued March 29, 1950. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ.

*Leonard F. Markel, Jr.,* with him *Alexander Schamban,* for appellant.

*A. Benjamin Scirica,* with him *Walton Coates* and *Smillie, Bean & Scirica,* for appellee.

OPINION BY HIRT, J., July 20, 1950:

The parties were married on May 4, 1947; the final separation occurred on January 19, 1948, when respondent left her husband in their common home in Bridgeport, Pennsylvania, and returned to her parents in nearby Philadelphia. The master, acknowledging "considerable difficulty with this case", nevertheless resolved the issue of credibility in favor of the libellant and found the single charge of indignities sustained by his testimony. The court, too, admitted uncertainty in disposing of the exceptions to the master's report, in stating: "The written testimony is not convincing beyond a doubtful balance". But the court nevertheless adopted the master's estimate of the credibility of libellant and entered a decree of divorce. These expressions of doubt by both the master and the lower court, at the very outset seriously question whether the charge has been sustained by that clear and satisfactory evidence essential to the granting of a divorce. Notwithstanding our due regard for the careful and conscientious analysis of the evidence by the master and his estimate of the credibility of the witnesses, our conclusion from an independent consideration of the whole record is that the decree must be reversed.

The respondent was a native Italian; libellant also was of Latin blood. In temperament both were volatile; they undoubtedly were incompatible but only in the sense that neither was willing to make the adjustment necessary to a reasonably successful marriage. Certainly, in any view of the testimony, the conduct of the respondent was not above criticism but the libellant also was at fault. We need not decide, however, whether they were so nearly equally at fault as to leave them where they put themselves and reverse on the familiar principle quoted in Goshorn v. Goshorn, 163 Pa. Superior Ct. 621, 63 A. 2d 135.

In October, 1946, about seven months before the marriage, libellant on his discharge from military service set up an office and started the private practice of his profession as a dentist, in Bridgeport. He was industrious and ambitious. In our view the source of much of the dissension between the parties is attributable to his inordinate determination to make a success of his practice even at the sacrifice of his marriage. He worked long hours during the day and often until 8:30 in the evening. His industry was rewarded; at the time of the separation his gross weekly earnings were more than $300.

The marriage got off to a bad start. At the wedding reception the respondent expressed impatience with her husband for handing a wedding gift of an envelope, apparently containing money, to his mother to keep for *him,* rather than to her. If there is foundation for the tradition that wedding gifts go to the bride, whatever embarrassment this incident caused the libellant, in the presence of one of the wedding guests, was invited by him.

Libellant complains of his wife's repeated desire to go to Philadelphia to visit her parents and of her insistence that he take her there. We are unable to find evidence of indignities in this conduct. Respondent was a stranger in Bridgeport and she had a natural fondness for her parents. Moreover there is no evidence of other than cordial relations between libellant and his wife's parents. He complained that after work at night he was too tired at times, even for the short trip to Philadelphia. It seems reasonably clear that arrangements could have been made to relieve him on that score. Respondent had applied $1000 of her own money on the purchase price of an automobile bought jointly by the parties. She was a qualified driver but was never allowed the use of the car unless the libellant was with her. It would appear that he might at least

have permitted her to drive the car to Philadelphia in the daytime when he had no use for it.

The first serious difficulty, which developed almost into a crisis, occurred on July 9, 1947, two months after the marriage. Libellant said that an argument ensued when he refused to take respondent to her mother and suggested that she go alone by train. He testified that she then just packed up and left. Her version of the incident is that the argument started when she renewed a request that he give her a weekly allowance to meet household expense to save her the humiliation of continually asking him for specific amounts for necessary purchases. She testified that the argument was revived late in the day and that in anger he then struck her and insisted that she go back to her mother. She packed a few things and left. Credence is given her testimony by the fact that instead of going to her mother she spent the night at the Y.W.C.A. in Philadelphia, registering under her maiden name. She said she was ashamed to go to her parents under the circumstances. The rift must have been serious, for two days later the parents of both parties met in the Philadelphia home of her parents to attempt a reconciliation. It may be noted that at this conference the libellant freely reviewed his wife's shortcomings but neither on that occasion nor on any other did he, in a single instance so far as disclosed by this record, confess any fault on his part.

Cordial relations between the parties, apparently, were never wholly restored and much of the wife's subsequent conduct, of which libellant complains, is explainable by the tension resulting from the above incident of July 1947. Libellant complains that his wife thereafter interfered with his dental practice. The few incidents referred to in the testimony are not serious in themselves though they may have been annoying to libellant. He did not lose a single patient because

of them although one new patient never returned. One of his complaints was that she telephoned her mother' "several times daily". The records of the telephone company, which libellant produced showed an average of about one call and never more than two calls each day. The toll charges were small. He was wilful and arbitrary in the method later adopted by him to stop this innocent practice. His dental office was in their home and he installed a switch, on the extension of the telephone service to the living quarters, and by means of it deprived her of the use of the telephone altogether. He is chargeable with other conduct which invited marital disaster. Beginning in the fall of 1947 he kept the doors of his office, leading to the living quarters, locked to exclude respondent from them. Under the circumstances libellant cannot charge her with eavesdropping in an occasional effort to find out what was going on behind these closed doors.

We need not refer to other incidents of alleged misconduct of the respondent. They are either insignificant or were invited by libellant. His domineering attitude toward his wife, is indicated in a number of incidents in this record but no more clearly than in an admission which he made on cross-examination. He had complained of daily arguments with his wife and he indicated one reason for them in this admission: "Every time I correct her on anything an argument always ensued" and he said that he corrected her "very frequent".

Under libellant's own testimony he has not shown himself to be an injured and innocent spouse and for that reason he is not entitled to a divorce.

Decree reversed and libel dismissed.