Blatt *v.* Blatt, Appellant.

Argued November 10, 1952. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS and GUNTHER, JJ. (ARNOLD, J., absent).

*Archibald M. Matthews,* for appellant.

*Clarence L. Shaver,* with him *Daryle R. Heckman* and *Shaver & Heckman,* for appellee.

OPINION BY DITHRICH, J., January 20, 1953:

In the quite recent case of *Hunter v. Hunter,* 169 Pa. Superior Ct. 498, 83 A. 2d 401, we had occasion to say (pp. 499, 500): "On a charge of indignities the lower court entered a decree of divorce. In spite of the fact that the master, from a patient analysis of

volumes of testimony, recommended a decree, we find it necessary to reverse. *The issue does not depend upon the credibility of witnesses but rather on the significance of undisputed facts established principally by plaintiff's own testimony which in our view reveal an injured but not an innocent husband.* [Emphasis added.] Under our divorce law—as amended by the Act of March 19, 1943, P. L. 21, 23 PS §10—to obtain a divorce from the bond of matrimony, a complaining spouse must be *both* injured and innocent." The same principle applies to this case.

The master in his report recommending the decree said: ". . . the marriage relationship has been a stormy one almost from its beginning resulting in a separation as early as 1937, another separation in 1947 and a final cleavage in 1949. . . . the marital difficulties became most serious in about the year 1945 and continued thus until the final parting on October 13, 1949, and it is this period of about four years which is [here] vitally involved."

The parties were married June 13, 1932, when defendant was 19 years of age and plaintiff 38, or twice the age of defendant. One child, a daughter, was born of the marriage January 16, 1945; another child, also a daughter, had been adopted November 19, 1943. It is in our opinion highly significant that throughout his testimony plaintiff testified largely from typewritten notes which he began making "As far back as 1945," the year their child was born, and, as stated by the master, the year in which "the marital difficulties became most serious," continuing "until the final parting on October 13, 1949." When asked on cross-examination if he had been preparing evidence against his wife over a period of five years he answered, "No. I didn't know whether we would have a case *but I was going to have a few notes ready in case we did.*" He

said the first note he kept was dated July 19, 1945, six months after the birth of their child.

Not only did he refer to his notes in testifying, but in general he was an extremely cautious, deliberate and, at times, evasive witness. For example, when asked how old defendant was when he married her he said, "A moment of computation and I will answer that." When asked if he did not think that the difference in their ages may have had something to do with the difference in their opinion as to how the home should be managed in the first year of their marriage, he answered, "No. If your face is dirty, your face is dirty." He admitted that "on numerous occasions" he called his wife a "moron" and made "slurring remarks" about "her mental ability."

In *Garroway v. Garroway,* 163 Pa. Superior Ct. 317, 61 A. 2d 379 (affirmed in 361 Pa. 464, 65 A. 2d 414), we said (p. 320) : "The source of the text of libellant's testimony also challenges his good faith. . . . he made daily notes of respondent's conduct, insofar as it suited his purpose. The libellant's testimony in this case is based largely on these voluminous notes which he was permitted to read into the record. The inference is inescapable that he . . . had in mind bringing a divorce action and that he started then to prepare his case. It may be assumed that the daily notes which he made do not put a construction on the acts of his wife most favorable to her, and the fact that libellant considered it necessary to make any notes of his wife's conduct casts doubt on the seriousness of her acts. One ordinarily does not need memoranda to aid him in recalling indignities which made his life burdensome."

He complained of her drinking too much, or in his own words, "I told her she was not drinking like a *gentleman.*" We assume the phrase "like a gentleman"

had reference to himself—otherwise we would be in a quandary as to what the requirement that a lady should "drink like a gentleman" entailed. The evidence indicates that she had neither a head nor a stomach for liquor, but he made no effort to keep it from her. There was always a plentiful supply of both beer and whisky in the home and they both drank socially, especially when with the "Country Club" crowd. Again referring to *Hunter v. Hunter,* supra, we said (p. 505) : "It may have been desirable that defendant stop drinking entirely. To accomplish that end plaintiff well might have set the example which undoubtedly would have been more effective than any precept." He has no just cause to complain that his wife, according to his standard, was not able to "drink like a gentleman." Cf. *Othmer v. Othmer,* 158 Pa. Superior Ct. 384, 45 A. 2d 389; *Carter v. Carter,* 166 Pa. Superior Ct. 499, 72 A. 2d 621.

In a bill of particulars plaintiff sets forth numerous alleged indignities occurring between July 19, 1945—when he made the first of his typewritten notes—and September, 1947, when he first brought suit for divorce. Most of them were inconsequential and the action was discontinued December 2, 1947, at the request of defendant. The parties agreed to "make a fresh start," but their marital difficulties began all over again in February and March of 1948 as a result of plaintiff's alleged misconduct with a woman who formerly worked in his office and who, at his suggestion, accompanied them on a trip to Florida to look after the children. Defendant may have been unduly suspicious of her husband and the other woman, but the fact that plaintiff left for home—he said in answer to a telephone call in regard to one of a chain of theaters in which he has a one-third interest—a few days after the woman left for home did nothing to

allay his wife's suspicions. She remained in Florida with the children six or seven weeks after the others had left for home. Plaintiff during that period did not rejoin his family but complained bitterly when his wife returned home with a colored couple she had engaged in Florida—a man to do the driving and his wife to help her with the children.

In July of that year when defendant was getting the children ready for a trip to Pittsburgh to do some shopping, an altercation arose during which plaintiff says defendant threw the automobile keys at him, striking him in the eye. The master found that "whereupon plaintiff took defendant by the shoulders and shook her without striking her," but could not "accept as verity" the testimony of Olive Patton. She testified that she and three other people were in the cellar cleaning when her little girl came downstairs and said, " 'Mother come quick they are upstairs fighting.' " She testified further: ". . . they were standing up and they were fighting. Finally Mr. Blatt got the best of Mrs. Blatt and she fell to the floor and Mr. Blatt got on top of her and was holding her down . . . He was pounding her. Finally he left her up." The master said he could not accept her testimony that "plaintiff had defendant on the floor [and] was on top of her beating her with his fists." With all due respect to the master, we are at a loss to understand why he could not accept the testimony of Mrs. Patton as to the use by plaintiff of his fists in the light of his admission that on the last night they spent together he hit defendant on the jaw with his fist, with the avowed purpose of "knocking her out." Also in his report the master said: "In a few instances the parties flatly contradict each other but in most instances defendant has not denied the occurrence nor her part in it." In our opinion her frankness is commendable when compared

with the evasive and contradictory testimony of plaintiff. In one instance at least we believe he led the master into making an important finding of fact that is not strictly in accordance with the evidence. In the bill of particulars plaintiff charged that because he would not buy defendant a new evening gown for the New Year's Eve party at the Country Club December 31, 1948, she sulked at the party, returned home in a rage and "tore her evening dress in shreds and piled the tatters on the bed." That is a fair statement of what happened, but the master found as a fact that she "tore all of her evening gowns to shreds." Plaintiff testified that she had several of them hanging in her closet. She testified she hadn't had a new dress for two or three years. His reply was, "You have fifty." It is one thing for a woman to tear the gown she is wearing to shreds and quite another thing for her to tear "all of her evening gowns to shreds."

Defendant testified that on one occasion when she had the baby in her arms plaintiff struck her on the side of her head, fracturing her left eardrum. He says he only slapped her, but admits she had to have medical attention for the injury to her ear. As an example of his evasiveness, when asked if his wife had ever had ear trouble before, he replied she "has gone to a doctor very frequently in her married life. Q. But I am asking as to her ear trouble. A. I don't know what she has gone for. Q. But you don't have any personal knowledge of her going for ear trouble do you? A. There were dozens of times she could have gone for that purpose."

Of the quarrel in the early morning hours of October 13 which led to the final separation, we said in *Commonwealth ex rel. Blatt v. Blatt,* 168 Pa. Superior Ct. 427, 429, 79 A. 2d. 126, a habeas corpus proceeding brought by plaintiff against defendant to deter-

mine the custody of their two daughters: "Most women are apt to resent being struck in the face, even though married to their assailant. That she became angry and threw things at him is not the subject of wonder . . . Her emotional instability quite often consisted of justifiable anger, for which he was as much or perhaps more responsible than was she. Nor do we regard his conduct as tending to 'stabilize' her emotions." We also said, speaking through Judge (now Mr. Justice) Arnold: "Unfortunately the case was tried as though it were a divorce action, and most of the record is given over to relator's complaints as to the conduct of his wife." The testimony in the present action is in large measure a rehash of the testimony in the habeas corpus proceeding where we reversed the decree of the learned court below and awarded the custody of the children to defendant, with whom they presently reside. Plaintiff does not appear to any better advantage in this proceeding than he did in the habeas corpus proceeding.

In his opinion overruling defendant's exceptions to the master's report the learned president judge said, with reference to the dastardly and cowardly blow: ". . . his testimony is that . . . on . . . the night of the culmination of their difficulties, he knocked her out because he was obliged to do so. . . . Perhaps to the extent that plaintiff used force he was at fault but bearing in mind the precise circumstances of each instance we cannot say that they make much if any difference." They may not "make much if any difference" to the learned court below, but to this Court they do. In our opinion the knockout blow demonstrates beyond any doubt that plaintiff was not an innocent spouse.

As a witness he was arrogant, overbearing and domineering. Upon cross-examination as to a trifling

incident in regard to the turning on and off of the radio, he admonished counsel for defendant: "I won't have you make too light of that incident. And the Judge would give me a divorce on that one action alone." When called in rebuttal his counsel said, "Now Mr. Blatt what have you to say in answer to Mrs. Blatt's testimony?" He answered, "I have rebuttal to give on three witnesses . . . before I touch on Mrs. Blatt if the Court so permits." And then, without waiting for the permission of the master and over the vehement objection of counsel for defendant, he proceeded to comment on the testimony of three other witnesses. And to make matters worse he was asked on direct examination, "To what do you attribute the failure of this marriage?" That was clearly not rebuttal evidence. Even if he had not stated fully in his examination in chief "To what [he] attribute[d] the failure" of the marriage, he had the opportunity so to do and should have availed himself of it. But from that point on he took over and proceeded at great length to repeat testimony he had previously given, interspersed with a running disparaging comment on the testimony of defendant and her corroborating witnesses. As part of his so-called rebuttal, he complained that his wife stated "over and over how I wanted to run things." Judging from his conduct after he had taken the witness stand in rebuttal, we have no difficulty in accepting as verity his wife's statement that he "wanted to run things." Not only wanted to, but did!

The learned court below in concluding that plaintiff is an innocent and injured spouse said: "In the instant case we do not mean to be understood as viewing this plaintiff without fault but this record does show in the matters he complains of he is largely free from fault as well as provocation."

In our review of the evidence, after giving due credit to the report of the master, who saw and heard the witnesses, and the opinion of the learned president judge, who has "personally known the parties . . . for a number of years and likewise many of the witnesses," we find the three most serious and outstanding incidents in the marital life of the parties to be: (1) the blow on the side of the head, according to her version—the "slapping . . . on the side of the face which gave her ear trouble," according to his; (2) the incident when she threw the car keys at him and he admits shaking her, but denies knocking her down and beating her, as testified to by her and an apparently disinterested and truthful witness; and (3) the knockout blow delivered by him the night they finally separated. On no one of these three occasions can plaintiff be said to have been the innocent spouse in any sense of the word, notwithstanding the apparent acceptance by the court below of his paltry excuse that "he knocked her out because he was obliged to do so." He was not in such danger as would justify such a blow, nor did he have reasonable grounds to believe that he was; and he could have brought the quarrel to a close before it reached such a serious stage by calling the police and leaving the house, as he finally did.

In the beginning we said "facts established principally by plaintiff's own testimony . . . reveal an injured but not an innocent husband": *Hunter v. Hunter,* supra, p. 500. He therefore is not entitled to a divorce. Cf. *Ritrovato v. Ritrovato,* 167 Pa. Superior Ct. 111, 74 A. 2d 504; *Benny v. Benny,* 167 Pa. Superior Ct. 227, 74 A. 2d 782; *Thornton v. Thornton,* 168 Pa. Superior Ct. 391, 77 A. 2d 691.

Decree reversed and complaint dismissed.