Welsh *v.* Welsh, Appellant.

Argued November 20, 1940.

Before
KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PAR-
KER, RHODES and HIRT, JJ.

*Paul V. Forster,* with him *George M. D. Richards,* for
appellant.

*Robert G. Hendricks,* for appellee.

OPINION BY PARKER, J., December 11, 1940:

A decree of absolute divorce was entered in favor of
libellant, after testimony before a master and on his
recommendation, on the ground of indignities to the
person as that term is defined by the statute.  The court

below adopted the findings of fact and recommendations of the master without discussion. As this appeal involves no new or novel question of law, our task is principally to pass our independent judgment on the facts.

This is not a case free from difficulty, due to the circumstance that there is a serious conflict in the evidence supplied by libellant and respondent. It has even been suggested that some of the testimony indicated perjury on the part of some witnesses. It is our conclusion that there were exhibited on each side instances of exaggeration and inaccuracy in testifying. If we were to point out all the discrepancies and analyze the testimony it would unduly extend this opinion.

We approach the problem with a few well settled principles in mind. "The burden of proof is upon libellant. He must establish his case by clear and satisfactory evidence and the weight of the evidence must be in his favor": *LaClair v. LaClair,* 128 Pa. Superior Ct. 469, 471, 194 A. 224. "Never ought divorces to be easily obtained, for marriage is the most sacred of human relations, and should never to be dissolved without clear proof of imperious reasons. We may do wrong to the parties and their children, and to the public, when we aid one party in severing the relation without a clear necessity. Indignities provoked by the complaining parties are of course no ground of divorce, unless when the retaliation is excessive": *Richards v. Richards,* 37 Pa. 225, 228.

The libellant, chief of police of Doylestown Borough, charged his wife with cruel and barbarous treatment and indignities to the person. He is a strong, powerful man who has kept himself physically fit, and he is a former member of the State Highway Patrol. The respondent weighed less than one hundred pounds. As the master and court below found, the charge of cruel and barbarous treatment was without merit as an independent cause for divorce, but the facts relied upon,

if believed, were competent as bearing on the other charge.

The libellant and the court below in its opinion relied upon several classes of alleged indignities: petit larceny by respondent; the use of violent, opprobrious and vile language directed against him, privately and in the hearing of others, some of the epithets suggesting moral turpitude; the accusation of his infidelity without proof; the use of vile language in his presence in referring to his parents; the unjust endeavor to persuade him not to aid his parents, who required his assistance, and the raising of controversies over that subject; the endeavor to have him discharged from his position; and physical abuse. As the libellant produced a number of witnesses whose testimony, if interpreted as the master did, corroborated many of his charges, it is necessary at this point to refer to the contentions of the respondent.

The wife made denials or attempted to explain away all of his charges. While there were inconsistencies and what we regard as inaccuracies in his testimony, if there were not other important matters of defense to which we will refer, he would probably have made out a case. This makes it necessary at this point to refer to the wife's contentions and particularly to an important feature of her case which is interwoven in the whole controversy.

The respondent's testimony tended to show that the parties, who were married in 1928, led a normal married life until about August, 1934. She testified that at that time he began to neglect her and used vile language in addressing her, but that she did not know definitely the cause of the rift. It was shown by his own witnesses that libellant and respondent had been accustomed to visit the parents of both parties three or four times a month, but when Christmas arrived he took his wife to her mother's home and left her there rather unceremoniously, promising to call for her. He did not

do so and she was required to get a relative to bring her to their home. She also stated that for the first time he made her no Christmas present that year.

A few days after Christmas she had occasion to use a wrench to turn on the water in a heater in the basement of their home when she went to his automobile for the wrench and found in the pocket of the car seven rubber protectors designed to be used in preventing conception. Two of these, having been used, were in handkerchiefs and five were in the original box in which they were sold. She confronted him with the evidence, saying, "Now I know why you are staying out to all hours; you are going with a woman." We quote further from her testimony: "He said, 'you dirty son-of-a-bitch, you,' and he jumped out of bed and I said, 'Here is the proof I have,' and he grabbed them out of my hand, these two used rubbers that were in the individual handkerchiefs ...... and he grabbed them out of my hand saying, 'Don't worry, you dirty rat, you will never get this evidence on me' ...... He grabbed the both of them out of my hands and took them down to the furnace and burned them, but I still had the five brand new ones that he left in the pocket of the car marked four dollars a dozen ...... I said, 'You have been talking so much all through my married life about this Marion Brown.' I said, 'Is it she that you are going out with?', and he admitted to me that it was, and he said to me also, 'I have been doing this since the first time we were ever married.'" The respondent testified that she immediately called his brother and that afternoon went with libellant to his home in another municipality and advised him and his wife as to what she had found and what their difficulties were.

Within a few days she called Marion Brown at her home and arranged to have Marion Brown come to their home. We quote from her testimony: "I said to this Mrs. Brown, 'Mrs. Brown,' I said, 'You are going out

with my husband; do you want to be the means of breaking up my home?' I said, 'You ought to be ashamed of yourself, going out with a married man.' I said, 'I want to know what you are going to do in regard to leaving my husband alone,' and she said, 'I am through with him.' Q. Was anything else said? A. Yes, then again before she left I said, 'Now I want to make sure and I want your answer whether you are going to leave my husband alone and not break up my home,' and she said, 'I am finished with him,' and in my presence before Mrs. Brown, when I asked the last time, Jimmy Welsh said to me, 'Do you want her to whistle it?' Q. Was anything said by Mr. Welsh after Mrs. Brown left? A. No, he left and went uptown." We will refer later to other circumstances which tend to corroborate respondent's testimony with reference to the finding of the "rubbers" and what was said and done in that connection.

The master virtually adopted the testimony of the libellant as to all the essential facts. We believe he erred in so doing and particularly in disregarding much of the testimony of libellant's own witnesses. We are of the opinion that the evidence as a whole supports a conclusion that the parties led a normal married life until about August, 1934. The parents of each resided in another town at some distance. The respondent's mother was a widow and libellant's father was suffering from asthma and they were in need of help. A fair arrangement was made by which the same amounts were sent to each, the respondent taking charge of the remittances and seeing that they were made. They frequently and regularly, "almost every week end", visited the parents together, and the parents and the members of their families did not realize there was any trouble between them until about August, 1934. A bank account was carried in the name of libellant, and respondent was permitted to sign checks upon it. The parents, his brother and sister-in-law, and other inti-

mate friends thought they were leading a normal life. The parties attended motion picture shows together every time there was a change of attractions. She accompanied him to Philadelphia where he attended night school and sat in the car knitting while he was endeavoring to improve his mind. They carried shares in their joint names in a building and loan association and took pleasure trips together.

About August, 1934, the libellant's parents left their own home and came to live with a brother of libellant. It is true that trouble began to brew about that same time, but it is also the time that Marion Brown came into the picture. While the respondent testified that she did not suspect any intimate relations between libellant and Marion Brown until Christmas, in our opinion her testimony in that respect was not satisfactory or consistent. It would have been better if she had been more candid.

After this time there was a decided change in the relations of the husband and wife. He spent much less time with her and remained out late at night when not in uniform. She testified that he dressed up, went out and refused to tell her where he was going. Their difficulties became more acute after the discovery of the "rubbers". While the wife still clung to him he left her permanently on July 1, 1935.

There is much corroboration of libellant's testimony to the effect that after August, 1934, respondent called libellant vile names and that she used similar language in referring to his parents, that they quarreled, that she scratched his face, and that he bumped her into an obstruction, seriously injuring her breast. Respondent testified that he called her the same names that he charged her with using.

With respect to swearing, the evidence of Gerald Hennessy, a main witness for libellant is significant: "Q. And you never heard Mr. Welsh swear? A. Swear? Oh, lots of times, oh my, lots of times, sure I heard him

swear. Nobody that knows him did not hear him. Get that straight. Q. Did he ever swear in the presence of his wife? A. Yes. Not at her." He set the example so that he will have to bear some responsibility for the introduction of violent language into their intimate conversations. We must remember that one of the main indignities relied upon by libellant was the character of the language used by the wife.

We are naturally led to the inquiry as to whether the libellant is "the innocent and injured spouse" (§10, Act May 2, 1929, P. L. 1237, 23 PS §10) and whether he provoked the alleged indignities. This brings us back to the occurrences in late December, 1934. Immediately after the discovery of the "rubbers", respondent called his brother and the brother's wife on the telephone, took her husband to their home and repeated the charge in his presence. We were impressed with the testimony of the brother and his wife. While the husband denied that he knew anything about the "rubbers" and that his wife had confronted him with them, libellant significantly said: "Q. Had you loaned your car out at any time? A. I frequently loaned my car out." The sister-in-law, after stating that Mrs. Welsh made the accusations in the presence of her husband and her, testified: "A. I said, 'Jimmie, is it true?' and he said, 'No.' I said, 'If you are running around, why don't you stop it?', he said, 'I am not running around.' Q. Did he make any attempt to explain the articles that were found in his car? A. Not that I can recall. I said, 'Jimmie, were they yours?', and he said, 'No.' Q. And that was the extent of his answers to what she said? A. That is what he said to me, anyway." In addition, as we have shown, respondent within three days summoned Mrs. Brown to the house and charged her in libellant's presence with stealing the affections of her husband. Mrs. Brown was not called as a witness to contradict any of the damaging testimony given against libellant and no excuse was given

428

for failing to call her although it appeared that she was employed in Doylestown. The husband made a very weak defense to these charges and will have to bear the consequences. We conclude that the libellant was not an innocent and injured spouse and that his conduct provoked the alleged indignities.

We have not overlooked the alleged indignities to the libellant in respect to larceny and endeavoring to procure the discharge of libellant as chief of police. Libellant offered evidence tending to show that respondent had taken a ten-cent powder puff from a store and a piece of cloth from an apartment. It is probable that something of that nature occurred, but it was long before the final breach and was apparently treated as trivial by the parties, although we do not so regard it. If it occurred it was reprehensible. It is claimed by libellant that respondent picked up a piece of cloth in a vacant apartment at which she and a friend were looking and made it into a hanging for the bathroom. This fact was known to libellant and some of their intimate friends but not to the public generally. The husband said he reprimanded her, but if he, a chief of police, allowed his wife to make use of the cloth in adorning their bathroom, he apparently did not act in accord with his claim of righteous indignation.

The testimony does not support the charge that the respondent endeavored to procure the discharge of her husband as chief of police. It will support a finding that she endeavored to have those with influence or in authority break up the intimacy between her husband and Mrs. Brown. We do not regard this as an indignity. Neither can the libellant get any comfort from his testimony as to physical abuse, and there is no merit in his complaint as to arguments about money matters. The wife undoubtedly did much that she should not have done, but as we view the evidence the libellant did not sustain the burden that rested on him.

We do not find a compelling and imperious reason for granting this divorce.

Decree reversed, the appellee to pay the costs.