Castner, Appellant, v. Castner.

Argued April 15, 1946. Before BALDRIGE, P. J., RHODES, HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ.

*Paul N. Barna,* for appellant.

*Joseph M. Loughran,* with him *D. M. Anderson* and *Scales, Loughran & Shaw,* for appellee.

OPINION BY BALDRIGE, P. J., July 19, 1946:

This appeal by the libellant is from the decree of the court below refusing to grant him a divorce on the ground of cruel and barbarous treatment and indignities after a master had made a report favorable to him. A master's recommendation is advisory only, but as we have frequently said, it is entitled to, and we in the exercise of our independent judgment have given it, careful consideration: *Philo v. Philo,* 154 Pa. Superior Ct. 563, 36 A. 2d 833. In viewing this record it must be kept in mind that the burden rests upon the libellant to establish by clear and satisfactory proof that he is entitled to a severance of the marital ties: *Welsh v. Welsh,* 142 Pa. Superior Ct. 421, 16 A. 2d 672; *Cobaugh v. Cobaugh,* 146 Pa. Superior Ct. 521, 22 A. 2d 764. It is for us to determine whether he has succeeded in so doing.

The parties were married in Westmoreland County on June 23, 1925, and immediately moved to Washington County. The libellant, employed as a janitor, is 42 years of age; the respondent is 39. Three children are living that were born to the marriage; two boys, now 18 and 13 years of age, live with their father, and a girl, 5 years of age, is with respondent's sister. In 1937 the respondent was confined to the Mercy, and later to the St. Francis, Hospital in Pittsburgh where she was under observation due to a nervous collapse. On September 7, 1938, the libellant had her committed to the Somerset County Home and Hospital as a psychiatric patient. She remained there for some unstated time when she was paroled in care of her mother, a resident of West-

moreland County. In February 1940 libellant instituted a divorce proceeding in Washington County. Sometime after the respondent caused an appearance to be entered in her behalf the libellant discontinued 'his action. Shortly thereafter they resumed living together and maintained their marital relations before respondent was committed to the Torrance State Hospital for the Insane. It is stipulated by the attorneys for both parties that the respondent is now confined there "as a hopeless lunatic or a person non compos mentis."

The libellant testified that he was compelled to move his home many times because the respondent's conduct disturbed their neighbors; that on numerous occasions she walked on the streets at night until she was picked up by men in cars and would not return home until late hours; that she often visited her mother with whom she would remain for a week or two at a time. He claims that frequently she used vile language, scratched his face, pulled his hair, threw knives and dishes at him, and charged him with intimacy with other women; that she attempted to poison him twice, spent the money he furnished for food to buy cosmetics, etc., and insisted upon having money for a fur coat, clothes, and luxuries which he could not afford; that she neglected the home and the children, and her conduct toward him was such that he was compelled to sleep in the cellar.

The libellant was corroborated to some extent by his two sons and several other witnesses. The testimony of these young boys related principally to events alleged to have occurred when the elder was about 10 years of age and the younger 8 years. In considering their testimony we cannot overlook the fact that they are living with their father and wanted to favor him.

Grover Sweitzer, a man 60 years of age who lived in the same apartment as the Castners, called by libellant, testified that every time he met respondent she tried "to make a date" with him. He first stated that he was approached by the respondent "before and since" she went

to Somerset, but later he fixed it as just before she was taken to Torrance, but acknowledged that he never saw her "do anything out of the way."

Mrs. Kitchens, another witness, said she heard respondent call libellant vile names and saw her throw dishes off the table, but on cross-examination it was disclosed that she was testifying to events, most of which occurred three days before respondent was removed to Torrance Hospital.

There was no evidence of any open and notorious exhibition of improper conduct or affection toward other men, which is essential if that type of evidence is relied upon to establish indignities to the person: *Harding v. Harding*, 156 Pa. Superior Ct. 438, 40 A. 2d 869. The evidence does not approach proof of adultery, but even if we assume that the respondent did pick up and associate with strange men, with whom she committed adultery, any sexual delinquency was condoned by the libellant as he lived with her from April 20, 1940, to July 24, 1940 (when she was taken to Torrance Hospital) during which period the last child was evidently conceived.

The testimony offered upon the part of the respondent indicated clearly that the libellant was not free from blame for the domestic quarrels that undoubtedly occurred. Mrs. Winters, who since 1936 lived directly across the hall from the Castners and whose bedroom window faces their apartment, testified that she heard the libellant charge his wife with infidelity, that when she denied these charges he said: " 'If you deny it I will put my fist down your throat.' " On different occasions he made ugly threats of inflicting bodily harm and called her vulgar names. This witness said that when the wife was physically attacked she would plead that her husband stop and on different occasions she saw marks and bruises on her body.

Many of the acts upon which the libellant relies to establish grounds for this divorce occurred during

periods when the respondent was suffering from a severe nervous condition and was emotionally unstable and irresponsible for her conduct. We concede that insanity itself is not a good ground of defense in a divorce proceeding "unless shown to have been responsible for respondent's conduct." *Benjeski v. Benjeski,* 150 Pa. Superior Ct. 57, 60, 27 A. 2d 266. A husband of an insane wife is in an unfortunate situation, often times requiring patience and self control, but violent actions, abusive language, vulgarity, etc., of a wife when insane does not constitute either indignities or cruel and barbarous treatment: *Crock v. Crock,* 96 Pa. Superior Ct. 377. She then is mentally incapable of such deliberated wilfulness and maliciousness essential to procuring a divorce on the grounds relied upon in this case. Furthermore, as noted above, it is apparent that the husband was not an injured and innocent spouse. Both parties during their married life were probably guilty of misconduct. We have no doubt, however, that many of the alleged indignities were provoked by him, especially before his wife became mentally ill, and are not grounds for a divorce: *Viney v. Viney,* 151 Pa. Superior Ct. 86, 88, 29 A. 2d 437.

We are not convinced, after a careful consideration of this record, that the libellant has successfully carried the burden of showing by clear and satisfactory evidence that he is entitled to a divorce: *Murfit v. Murfit,* 134 Pa. Superior Ct. 327, 333, 3 A. 2d 1020.

The learned court below was in doubt as to its jurisdiction, because the respondent had filed a petition for the appointment of a committee as provided for by the Act of May 18, 1937, P. L. 719, instead of having a guardian appointed as required by Pennsylvania Procedural Rules, Goodrich-Amram, §2053. The committee defended this case and at all times protected the interest of the incompetent and performed the same duties as a guardian, if one had been appointed. In view of our conclusion that this libellant has failed to prove by the quality and

392

quantity of evidence required, that he is the innocent and injured spouse and entitled to a divorce it is unnecessary to discuss further this jurisdictional question.

The assignments of error are overruled, and the decree of the lower court is affirmed at appellant's costs.