## Ryce v. Ryce

*Samuel Kagle*, for plaintiff.

*Samuel C. Nissenbaum* and *M. E. Maurer*, for defendant.

ALESSANDRONI, P. J., November 14, 1955.—Plaintiff filed a complaint in divorce a. v. m. on the ground of desertion; defendant answered denying the desertion. Subsequent to the first master's hearing an amended complaint was filed offering indignities to the person and impotency as additional grounds for divorce. Thereafter, the master heard additional testi-

mony in support of these grounds. The master's report recommended that a decree in divorce a. v. m. be granted on the grounds of desertion, indignities to the person and impotency. Defendant filed exceptions.

The parties were married on April 14, 1952, at Bel Air, Maryland. Prior to the ceremony, plaintiff, a career naval officer, was stationed at Newport, R. I., and defendant resided in Philadelphia. Immediately after the marriage the parties took up residence at the naval base at Newport, R. I. Defendant, on June 20th, returned to her parents' home in Philadelphia. Plaintiff's complaint alleges that the desertion took place on or about June 20, 1952. The additional grounds for divorce in the amended complaint allege indignities from April 14, 1952, to March 17, 1954, and also allege that defendant was, on April 14, 1952, the date of the marriage, naturally and incurably impotent and incapable of procreation.

In support of the charge of desertion plaintiff testified that defendant never spent a night with him after June 20, 1952; the parties had an apartment at 1428 Grange Street for approximately a year, from May 1953 until May 1954; during that period, although defendant was at home in the apartment most of the day, she would return to her parents' home in the evening. In support of the allegation of indignities, plaintiff testified to numerous incidents where defendant embarrassed him at various social functions incidental to his duties and status as a naval officer.

To establish impotency on the part of defendant, plaintiff testified that this marriage was never consummated; it is apparently unquestioned that defendant not only refused to have sexual relations with plaintiff, but defendant stated that it was impossible to have such relations. She also refused to be examined by a physician to determine whether or not she was capable of sexual intercourse.

This is a tragic case because it appears without question that defendant suffers a severe mental illness, as will appear hereafter. It is regrettable, in retrospect, that plaintiff failed to heed the various manifestations of the condition. It is not within the province of the court in an action of divorce a. v. m. to discuss the validity of the marriage itself, nevertheless, it appears that the validity of this marriage might be open to serious question, ab initio.

In June 1952, defendant returned to Philadelphia from Newport, Rhode Island. The ostensible reason for this trip was certain injections for menstrual trouble. Defendant remained in Philadelphia and in August 1952, plaintiff was notified by telephone that defendant was ill. He returned to Philadelphia from Newport to find his wife in a highly excited condition and incoherent. A psychiatrist was consulted, and he ordered her admission to a mental institution.

On August 11, 1952, defendant was committed to the Philadelphia Psychiatric Hospital. The initial diagnosis on admission was dementia praecox; the diagnosis on discharge was schizophrenic reaction, catatonic type. Defendant was discharged on November 1, 1952, as unimproved, with a guarded prognosis. She was readmitted on November 12, 1952, and discharged on January 14, 1953, as improved with a guarded prognosis. The final diagnosis, on the latter discharge, was schizophrenic reaction, mixed type.

The statement made by plaintiff at the time of admission is very significant. In the history, he stated that he had been married to the patient for six months, and "she has been severely ill all that time". As a matter of fact, the events of their wedding day, which he described at great length, are extremely eloquent. On the day in question, plaintiff was getting ready to return to Newport. He had proposed on many occa-

sions since his having met defendant in California in 1948. On April 14, 1952, she suddenly said, "Let's get married". Parenthetically, it is noteworthy that while plaintiff was on duty during the Korean action he wrote regularly to defendant, and during that period he never received a reply.

They arrived in Elkton, Md., sometime during the night. On the way defendant had become car sick and they had stopped at a service station so she could go to the ladies' room. After 20 minutes had elapsed, plaintiff asked the attendant to open the door to the bathroom. He entered and found defendant with her dress off, talking about heaven and stating that she had a "passionate discharge". Repeatedly she stated to him, "You do love me". When they arrived at Bel Air, Md., she was reluctant to enter the courthouse and suggested they walk around first. She became very tense and stated that she had a dropped ovary, and asked him again whether he wanted to marry her. After walking around for sometime, they finally obtained a license. When they went to the minister's home for the ceremony, she again evinced considerable reluctance, and they walked again. Defendant reiterated her statement about the dropped ovary and questioned plaintiff as to whether he wanted to marry her. Finally, she said, "let's go get married", and they did.

Immediately after the ceremony defendant telephoned her parents; while speaking to her father she became hysterical and told him that she was losing her brain power. On the drive back to Philadelphia she called her husband all kinds of names, stating that she was being hypnotized by him; she was ranting and raving. They returned to the parents' home for a few days before going to Atlantic City on a short honeymoon. During this time defendant constantly complained of dizziness and pains on the top of her head. She refused to consummate the marriage.

They then moved to Newport; plaintiff obtained quarters for them, however, defendant did not prepare the meals or clean the house. In June of 1952 she told her husband that she was spitting up blood and said that she ought to come back to Philadelphia to get it straightened out. Plaintiff found no evidence of blood. In August 1952, plaintiff was called to Philadelphia and told that defendant was sick. Plaintiff arrived in Philadelphia shortly before defendant was admitted to the Philadelphia Psychiatric Hospital and, according to her father, she was "ranting and raving and frothing at the mouth, saying things like the world was coming to an end and she was to blame for it". She was very excited and rambled incoherently. During the middle of that night she started screaming and rambling incoherently. On Sunday morning defendant stated that her body was filled with water and that her body was full of air and also that her husband had caused her bones to fall apart and had taken all of her blood. The source of this evidence is the statement plaintiff gave to the hospital on admission of his wife.

It is quite apparent that this defendant was seriously ill. There is nothing in the testimony which would establish or attempt to establish that the acts of which plaintiff complains are not unrelated to her mental condition. It is of course axiomatic that a divorce cannot be obtained where the spouse, against which complaint is made, is mentally ill, unless the acts depended upon to sustain the complaint are acts unrelated to the mental illness: Tait v. Tait, 12 D. & C. 25. Most assuredly in this case plaintiff should have been warned by the abnormal actions of defendant on their wedding day.

This court of course recognizes that an individual could be "so in love" that slight aberrations from the norm could easily be overlooked. We do not think,

however, that the actions of defendant as recounted by plaintiff could be said to be slight aberrations. Hence, our earlier comment on the validity of the marriage.

Plaintiff urges that there has been no adjudication of insanity and, hence, the burden is on the defendant to establish that condition by competent evidence. The fatal defect in plaintiff's position is the fact that practically all of the information concerning his wife's mental condition came from his own statement.

Therefore, when an indication of mental illness is introduced by plaintiff into the case, it would appear only logical to require him to establish the grounds for divorce as being unrelated to the mental illness. This is merely a variation of the principle that plaintiff must establish by clear and satisfactory evidence that he is entitled to a decree.

That burden though stated in the abstract must comprehend all of the variations of circumstances which arise out of the marital relationship. Therefore, the burden must and does vary with the particular and peculiar circumstances of each case.

The Commonwealth has an unquestioned interest in the marital relationship; it is interesting to note that insanity is not set forth as a defense, and defendant has not assumed the burden of proving the status.

The element of the mental condition of defendant was introduced by plaintiff. We cannot, therefore, accept the master's conclusion that there was not an iota of evidence to establish the mental illness of defendant. It fairly shrieks from the record, and the major part of that testimony was plaintiff's own statements to the hospital upon the admission of his wife for treatment.

This case is not the usual one of establishing a defense; rather, it is a matter of the failure of plaintiff to establish the right to a divorce by clear and con-

vincing evidence. We are convinced that plaintiff has not discharged the burden committed to him, albeit under the facts of this case, an onerous one.

A master's recommendation is only advisory; it is entitled to careful consideration; but, we must and do exercise our independent judgment: Castner v. Castner, 159 Pa. Superior Ct. 387.

As plaintiff has not established a case entitling him to a decree, the exceptions of defendant must be sustained.

*Order*

And now, to wit, November 14, 1955, defendant's exceptions are sustained; plaintiff's complaint is dismissed.