## Olbum v. Olbum, Appellant.

Argued November 19, 1956. Before HIRT, GUNTHER, WRIGHT, WOODSIDE, and CARR, JJ. (RHODES, P. J., and ERVIN, J., absent).

*John A. Metz, Jr.,* for appellant.

*Marjorie Hanson Matson,* with her *David Olbum,* and *William J. Graham,* for appellee.

OPINION BY GUNTHER, J., December 28, 1956:

Dorothy K. Olbum, the defendant, has appealed from the decree of the Court of Common Pleas of Allegheny County granting a divorce on the ground of indignities to her husband, Ira Olbum, the plaintiff.

The complaint was filed on August 2, 1951 and an answer denying the charge was filed September 14, 1951. After a lengthy hearing, the master recommended that a divorce be granted on the charge of indignities, and the court below sustained his recommendation. Exceptions were filed and the court below dismissed defendant's exceptions and granted the divorce on the ground of indignities. This appeal by the defendant followed.

It is our duty to examine the evidence de novo for the purpose of determining whether the charge alleged in the complaint has been sustained. *Hurley v. Hur-*

*ley,* 180 Pa. Superior Ct. 364, 119 A. 2d 634; *Boyles v. Boyles,* 179 Pa. Superior Ct. 184, 116 A. 2d 248.

The parties were married in Steubenville, Ohio in February, 1935 and remarried in Pittsburgh in June of the same year. They have one child, a boy, adopted in March, 1947. They have lived in Pittsburgh until November, 1942, when the husband entered military service. The defendant wife also entered military service in February, 1943. The husband was honorably discharged in November, 1945, and the wife likewise was separated in February, 1946, when they returned and resumed living together in Pittsburgh. The husband finally left the matrimonial domicile on June 27, 1951.

At the time of marriage, the wife was employed as a section manager at Gimbels department store and the husband was a clerk in his father's furniture store. Later on, the wife was personnel director, supervising the relations of some 2,000 employees. During this interval, the wife earned more money than the husband and many of the quarrels during the early years of their marriage centered around inadequate income of the husband and the fact that the husband had virtually no interest in the furniture business. After their respective separations from service and resumption of marital life, the disagreements and quarrels continued with increasing severity and, while to their friends and acquaintances the marriage appeared to be harmonious, their life was dotted with arguments, fights, physical abuse and violent outbursts of temper.

Plaintiff's testimony covers many complaints relative to the conduct of defendant. The wife would become very angry and beat the husband with her fists and kick him in the groin, swear and call him fighting names such as son of a bitch, a dirty kike, bastard. This course of conduct continued even when the par-

ties retired, and when the husband refused to argue with her, she became very enraged and reached over to the bed and beat him with her fists. Many of the arguments lasted until three or four o'clock in the morning and he would be forced to leave the common abode until he thought she was asleep. She objected to his working schedule, claiming it interfered with her social calendar; she demanded that he talk to his father and demand some assurance that some day the business would be turned over to him. During social gatherings the wife would comment on his work to state that he only worked for his father and had nothing to do with the business. She often referred to his parents as kikes. On several occasions she threatened to commit suicide and at one time went into the kitchen and turned on the gas range. He went in and opened the window and finally got her out. For several months during 1951, prior to his leaving her, he was under the care of a dermatologist for neuro-dermatitis and was also treated for nervous tension. Finally on June 2, 1951, the wife told her husband she hated him and demanded that he leave the house. Although this was in the middle of the night, she refused to let him take the car and defendant walked ten blocks to his father's house, borrowed a car and went to a hotel. Two days later the wife demanded his return since she was sick and unable to take care of the child. He returned, remained for three weeks, and when the fights, arguments and threats of suicide continued, defendant left for good. Many of these complaints were admitted by the wife in varying degrees. Further, in a letter to her father-in-law dated July 4, 1951 she said:

"No matter how rotten I've been—how bad my temper is I have not sinned against Oakie (the plaintiff). I have not committed adultery nor have I any other

interest in any other men. I have not been a good wife but he, too, has failed as a husband. I am only asking, Dad, for another chance . . . Dad, Oakie was the silent suffering kind, and I was the selfish one who didn't take time out to realize why and what was wrong. I know now a hundred ways in which I can improve and correct myself . . ."

The real difficulties between the parties centered around a more serious code of marital ethics followed by the wife. In 1938, the wife became acquainted with David Barthfeld, an employe at Gimbels. Thereafter, until he left for the service in 1942, Barthfeld was included in many of the social activities of the wife and husband and, in the course of time, he fell in love with the wife. When this romance was discovered by the husband in 1942, upon discovering a series of amorous letters in his wife's night table drawer, she admitted that she had been seeing a lot of Barthfeld, and it was suggested that the husband should talk the matter over with him. This was done, and it was decided that nothing should be done during the period of war; if, during such period the wife and husband decided on a final separation, that decision was to be made after the war, as the wife "was not sure of myself." At any rate, at that time, the wife decided to stay with her husband and promised she would have nothing else to do with Mr. Barthfeld, in letters, or seeing him or anything else.

Notwithstanding this promise made in May or June of 1942, the wife, unknown to plaintiff, continued to correspond with Mr. Barthfeld and personally visited with him on several occasions. From a reading of the sixteen letters found by the husband and introduced into evidence, it is difficult for us to conclude that Mr. Barthfeld did not receive encouragement from

the defendant wife and that there was no understanding or expectancy of ultimate marriage. In view of the wife's promises not to see or write any longer to Barthfeld, if these letters, written subsequent to the promise, had come into the possession of the husband on his return from military service, it seems most probable that a separation would have taken place at that time. Excerpts from a few of the letters speak for themselves: ". . . I am not ashamed of you, I love you—it's just a sin that we can't come out in the open with it and I keep forgetting myself. . . . Its Saturday nite and always was our night together. . . . I am horribly frightened that you may change your mind about marrying insignificant little me. . . . It won't be easy, honey, time or difference doesn't always soften the blow. I wish you would marry me now—I really need you—but I know that's impossible for you to do right now, guess a little longer won't hurt—I'll try to be patient. . . . Honey, when I don't hear from you for two or three days, I imagine all sorts of things . . . "These same letters refer to the kisses she sent and "to your hair, I'm going to mess it all up, kiss me darling, your lips are so soft and sweet, hold my hand, dearest, touch my cheek, honey, dance with me sweetheart, how wonderful to have you in my arms" and other terms of endearment. They refer to the 5th (anniversary of meeting) which was remembered by telegram from the defendant, to numerous long distance telephone calls and to various meetings between them.

Barthfeld could not consummate his desire; he was killed in action in France at the battle of St. Lo in 1944. When the defendant informed plaintiff of his death, plaintiff wrote, in part as follows: "Sorry to hear about Dave's death especially since he was only in combat 1 week. But I guess that's the way it was

meant to be and now that the matter of your infatuation is over, we can settle down to our normal marriage . . . ."

These letters to the wife were not discovered by plaintiff until after the commencement of the divorce action. On this appeal, it was strongly urged that the Barthfeld letters discovered in 1953 are wholly irrelevant and could not support the charge of indignities. We cannot agree with such contention. As stated by the court below: "Even though the plaintiff was not aware of Barthfeld's second series of letters until after he had filed his divorce action, these letters may explain to some extent the conduct of the defendant when they were reunited after the war. . . . The expressions of love and affection and the hopes of an early marriage between the defendant and Barthfeld, which seemed to be indicated in the correspondence, may have and probably did influence the defendant in her subsequent attitude." Cf. *Phipps v. Phipps*, 368 Pa. 291, 81 A. 2d 523.

The burden was on plaintiff to prove a legal cause for divorce. It was necessary for him to establish such a course of conduct on the part of the defendant as to render his condition intolerable and his life burdensome by evidence from which an inference of settled hatred could be deduced. *Faszczewski v. Faszczewski*, 182 Pa. Superior Ct. 295, 126 A. 2d 773; *Monaco v. Monaco*, 160 Pa. Superior Ct. 117, 50 A. 2d 520; *Moyer v. Moyer*, 181 Pa. Superior Ct. 400, 124 A. 2d 632; *Politylo v. Politylo*, 173 Pa. Superior Ct. 223, 95 A. 2d 241. We believe plaintiff has met that burden upon a review of the entire record. The record supplies ample proof that the wife acted in a spirit of malevolence not only as to the physical abuse extended to her husband but also as to the mental abuse. While the

first group of letters writing previously referred to may have been indiscreet, a continuation of the correspondence referred to shows an attitude of indifference and even estrangement in view of her promise not to see or write to Barthfeld. When pressed for an answer as to why these letters were saved, her only answer was: "I saved them. I can't give you an answer." As stated by our President Judge RHODES in his concurring opinion in *Allen v. Allen,* 165 Pa. Superior Ct. 379, 67 A. 2d 629: "This Court has consistently held, in subsequent decisions, that a wife's affair with another man, in itself, may constitute an indignity . . . ."

It must appear clearly from the evidence that the plaintiff was the injured and innocent spouse in order to entitle him to a divorce. *Matovcik v. Matovcik,* 173 Pa. Superior Ct. 267, 98 A. 2d 238. A review of this record leaves no doubt whatever on this score. In making our own independent review of the record which exceeds five hundred printed pages of testimony, we have given fullest consideration to the conclusion of the master upon the question of credibility. While the master's findings are advisory only both upon the court below and upon this court, where credibility is involved, his findings in that regard are to be given the fullest consideration and should not be lightly disregarded. *Green v. Green,* 182 Pa. Superior Ct. 287, 126 A. 2d 477; *Greer v. Greer,* 178 Pa. Superior Ct. 643, 115 A. 2d 794; *Hurley v. Hurley,* 180 Pa. Superior Ct. 364, 119 A. 2d 634. The trial judge who evaluated the evidence is an experienced jurist and his findings, in this respect, are entitled to much weight. *Schaufler v. Schaufler,* 177 Pa. Superior Ct. 515, 110 A. 2d 867.

Decree affirmed.