## Rowles v. Rowles

*H. Brown Fry*, for plaintiff.

CRYTZER, P. J., July 3, 1957.—In September 1954, plaintiff, then aged 19 years, was in the United States Army. He stopped at his Juniata County home while on leave immediately prior to departing for overseas duty. He and defendant, then 18 years old, went to Towson, Md., and were married. After spending 11 days together, during which brief interlude the parties did not set up housekeeping in a home of their own, plaintiff was shipped to an army camp near Bordeaux in southern France.

Defendant then secured a job and left her Juniata County home to live in Harrisburg. During the following year, news leaked through to plaintiff that his wife was "running around" and having an affair with

another man. Finally, another Juniata County boy was sent to Europe by the army, and after plaintiff insisted on learning the truth, the rumors were verified. Terribly shocked and upset, plaintiff immediately wrote to defendant and asked her concerning the report. He received a speedy answer from her in which she stated the report was true and that she was leaving Pennsylvania to make it easier for both of them.

Badly broken up by his wife's admissions, plaintiff sought help and advice from the depot chaplain, got a 30-day leave and flew home to try to save his marriage. Defendant had suddenly departed from her Harrisburg apartment, so plaintiff went to her parental home. They knew nothing concerning her whereabouts, but in a few days received a letter from her, which they gave plaintiff to read, stating she was living in Wilmington, Del. Staying at defendant's parents' home, plaintiff conducted a search and pursuit of his meandering mate. One night at a dance in Huntingdon County, Pa., he found her with "her boy friend".

The three of them went to the automobile which had transported defendant and her escort to the dance. Plaintiff offered to forgive all if defendant would go home with him and they could start anew. Defendant refused, stating her marriage to plaintiff had been a big mistake, she was living with the other man, she would not live with plaintiff and she never wanted to see him again. All this conversation took place in the presence of the other man, who is named nowhere in the transcript, but who is identified as one of plaintiff's first cousins.

Plaintiff's leave expired and he had to return for another year's service in the army. He stated: "I was emotionally upset and nervous and it has been a long, hard time to get over it, and I do not feel that I will ever completely forget about it". Defendant moved to a trailer park at Middletown, Pa., where plaintiff testi-

fied that she is not living alone. Every time defendant comes to Juniata County, the "other man" brings her and takes her away. This open flaunting by the couple in plaintiff's neighborhood and among his family has been very embarrassing and humiliating to plaintiff.

No children were born of this marriage.

The facts are not in dispute, nor is there any question of credibility of the witness. The learned master does not recommend the divorce be granted on the legal principles that 11 days of cohabitation are too short a period to establish a course of conduct (there was no evidence of indignities during this "honeymoon") and the language of the statute requires the indignities to be "offered to the person".

Plaintiff's counsel has filed exceptions to the master's refusal to recommend a divorce for the above reasons.

## Discussion

1. Length of cohabitation required to establish a course of conduct.

The master is entirely right in holding that a period of 11 days' cohabitation is too short a time to establish a course of conduct constituting indignities.

Divorces for indignities have been granted in cases where the parties have lived together for only 10 weeks: (Kranch v. Kranch, 170 Pa. Superior Ct. 169 (1951)); for 37 days (Hicks v. Hicks, 33 Erie 102 1950)); for 14 weeks (Bender v. Bender, 50 Lanc. 87 (1946)); or for four and one-half months: Carroll v. Carroll, 27 Wash. Co. 15 (1947). Divorces have been refused in cases where the parties have lived together for three to seven weeks (Rigby v. Rigby, 31 Del. Co. 265 (1943)); for two weeks (Sutton v. Sutton, 11 Fayette 27 (1948)); Shay v. Shay (51 Lanc. 245 (1949)); for 16 weeks: Dively v. Dively, 2 Cumb. 84 (1952).

However, in the instant case, no indignities were alleged nor evidence thereof offered during the 11-day period of cohabitation; the indignities did not begin until the following year.

On this principle, we affirm and approve the conclusion of the master.

2. Misconduct with the opposite sex as indignities.

For many years, a number of our courts reasoned as follows: Adultery is a statutory ground for divorce, and provided it is proven by sufficient competent evidence, is not condoned, and the libellant is the innocent spouse, a divorce will be awarded. "Affairs" with the opposite sex which do not embrace sufficient evidence to legally establish adultery do not entitle the injured and innocent spouse to a divorce on the grounds of adultery; ergo, said "affairs" cannot be considered an indignity to the person in a divorce action.

A rash of this reasoning appeared as late as 10 years ago. See Debolt v. Debolt, 11 Fayette 21; Persichitti v. Persichitti, 9 Fayette 148; Keeler v. Keeler, 47 Lack. Jur. 205; Valvano v. Valvano, 47 Lack. Jur. 197; Bronson v. Bronson, 47 Lack. Jur. 186; Snyder v. Snyder, 19 Lehigh 218.

The factors which may be considered in a divorce action based on indignities include a repeated and continuous course of conduct consisting of vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, malignant ridicule and every other plain manifestation of settled hate and estrangement which renders plaintiff's condition intolerable and life itself a burden.

What course of conduct is more illustrative of these criteria than a wife's going to live with another man while the husband is in overseas military service and then telling him when he flies home to save their marriage that she is not in love with him, their marriage

was a big mistake, she will never live with him, she never wanted to see him again and she will continue to live with the other man? She then continues to live with the other man and they flaunt themselves in the husband's home community. The humility caused by two years of this conduct was not ameliorated by the other man's relationship as a first cousin of plaintiff.

We have long considered physical abuse as an indignity. A kicked shin, a bruised arm or a black eye is not so soul searing, mind sickening nor heart breaking as the knowledge that a wife is keeping her promise to continue living with and, day and night, lying in the arms of another man.

Perhaps the first Pennsylvania appellate court decision to break through the barrier was Dearth v. Dearth, 141 Pa. Superior Ct. 344, 15 A. 2d 37 (1940), where the court, in a 4 to 2 decision, held that a wife's conduct of persisting in continuing her association with another man warranted a divorce on the ground of indignity to the person.

In 1945, the Supreme Court in Wick v. Wick, 352 Pa. 25, 42 A. 2d 76, in a unanimous decision held: "Conduct by a husband with other women, although not sufficient to support a charge of adultery, may be considered as a form of personal indignity to his wife rendering her condition intolerable and life burdensome". (Syllabus.)

The above stated position has been iterated and reiterated in the following appellate court divorce decisions: Olbum v. Olbum, 183 Pa. Superior Ct. 5, 128 A. 2d 125; Allen v. Allen, 165 Pa. Superior Ct. 379, 67 A. 2d 629; Macormac v. Macormac, 159 Pa. Superior Ct. 378, 48 A. 2d 136; Castner v. Castner, 159 Pa. Superior Ct. 387, 48 A. 2d 117; Smith v. Smith, 157 Pa. Superior Ct. 582, 43 A. 2d 371; Lowe v. Lowe, 148 Pa. Superior Ct. 439, 25 A. 2d 781; Wilson v. Wilson, 163 Pa. Superior Ct. 546, 63 A. 2d 104; Priest v. Priest,

162 Pa. 232, 57 A. 2d 437; and Blansett v. Blansett, 162 Pa. Superior Ct. 45, 56 A. 2d 341; and in the following lower court cases: Boyle v. Boyle, 22 Lehigh 153; Werner v. Werner, 21 Northumb. 143; Kemery v. Kemery, 37 Berks 235; Paul v. Paul, 15 Cambria 201; Beggs v. Beggs, 57 D. & C. 487; Morris v. Morris, 98 Pitts. L. J. 282; Rabuck v. Rabuck, 46 Schuyl. 152, and Moyer v. Moyer, 5 Bucks 129.

3. Must the act be done in plaintiff's presence to be an indignity?

The statute requires that the indignities be offered "to the person". For some years, many courts interpreted this to mean "in the presence of". See King v. King, no. 101, August term, 1942 (Perry Co.). There can be quite a difference, especially in light of the recent decisions that misbehavior with one of the opposite sex is an indignity. It would indeed be naive to assume that most promiscuity with the "other man" or the "other woman" was enjoyed in the presence of the injured spouse. The courts have held such behavior, if persisted in, to be an indignity. Of course, the corollary that an indignity can be created in absentia follows of necessity, and the courts have recently so held. See the appellate court cases, supra: Macormac v. Macormac, Smith v. Smith, and the Northumberland case of Werner v. Werner. In these cases, the misbehavior constituting indignities arose after the spouses had separated, just as in the current case. The contrary is held in Beisel v. Beisel, 23 Lehigh 125, 63 York 76, wherein the court stated that the wife's continuous indiscretions with other men had to be in the presence of the husband and others. We prefer the position taken by the other courts, but this case complies even with the strict requirements of the Beisel opinion.

4. Weight to be given master's report.

Many cases, including the very recent Olbum v. Olbum, supra, have held that the master's report is

only advisory. However, where there are factual matters in dispute, the master is better able to test the credibility of witnesses and great weight should be given his findings and recommendations. But where there is no disagreement on the facts and the only question is one of applying the law, as here, the court is under the duty to properly do so, whether his conclusions agree with or reverse the master.

5. Effect of other possible grounds for divorce.

True, plaintiff may have other grounds for divorce. However, the time has not yet expired for desertion and he would run afoul of the theory that the parties must have established a common habitation before there can be a desertion therefrom: Carl v. Carl, 48 D. & C. 459. By employing the proper detective agency, at great cost, added humiliation, embarrassment and open ridicule, he might garner sufficient evidence to legally prove himself to be the cuckolded husband. And that by his first cousin. I suspect there are those (but not including members of the judiciary, of course) who feel the greater punishment may result from the philandering wife and her paramour having to live together rather than being prohibited (for the public welfare) from marrying each other during the lifetime of the innocent spouse.

Plaintiff has made out a divorce case on indignities according to the recent court decisions. Such would not have been true at the time the master and the court began the practice of law. But the law changeth, and so do the interpretations thereof.

### Order

And now, July 3, 1957, in accordance with the foregoing opinion, the pertinent exceptions of plaintiff are sustained, and the divorce of the within parties is this day decreed in accordance with the divorce decree filed herewith.