Albrecht, Appellant, *v.* Albrecht.

Argued October 4, 1954. Before RHODES, P. J., HIRT, ROSS, GUNTHER, WRIGHT, WOODSIDE and ERVIN, JJ.

*David H. Kubert,* for appellant.

*Roy Martin Boyd,* with him *Charles H. Brunner, Jr.,* for appellee.

OPINION BY ERVIN, J., November 15, 1954:

This is an appeal from the order of the Court of Common Pleas No. 5 of Philadelphia County dismissing exceptions to the master's report and dismissing the complaint in divorce a.v.m. It was a bitterly fought contest in which there were twenty master's hearings and 938 pages of testimony. We have care-

fully reviewed the testimony and have concluded that the case was properly decided by the master and the lower court.

The parties were married December 9, 1925 and at the time the appellant was thirty-three years of age and the appellee was twenty-nine years of age. They lived together in Narbeth until January 5, 1952, at which time the appellant left their common abode and went to the Bala Apartments to reside. One son was born to the parties on January 27, 1928. At the time of the hearing he was married and worked as a florist for his father.

The marriage was fairly harmonious until 1940. The appellant testified that at a florists' party in Reading he and Jack Coxe left appellee and others, went up to the fifth floor of the hotel and entered a room where two strange show girls were and kidded with them, when his wife came along and complained about it. Certainly this was not an indignity to the appellant but could have been considered one to the appellee. In 1941 the appellant's company gave a party for their employees and wives and he testified that while he was dancing with one of his employees the appellee "kicked me in the pants" and then pulled him away from his dancing partner, whereupon the appellee went off and danced with someone else. The appellee testified that she merely tapped the appellant on the shoulder and told him not to forget that she was there as he had not danced with her for about three hours. He testified that in 1945 she threw a shovel of coal at him in the greenhouse. She said that he locked her out of the house in winter without a coat and this made her angry and that she followed him to the greenhouse and threw a piece of coal at him. The appellant admitted that he locked her out of the house on numerous occasions. In 1946 she got a Scout

hatchet and held it over his head. She said he had hit her on the head and hurt her and that she threatened to come after him with the hatchet if he hurt her again. He testified that he overpowered her and took the hatchet away from her. She testified that she put it back where it belonged. Their son John contradicted both by saying that he took the hatchet from his mother. In 1945 appellant purchased a house in Beach Haven and he stated that things were pleasant for the first season there. In 1946, in July or August, he stated that she criticized him for visiting neighbors and spending his time on the beach and leaving her alone at home. Appellant also stated that she would leave dirty dishes in the sink for several days at a time and that the house was not kept clean. She, on the other hand, testified that she took care of the house. Some of appellant's witnesses corroborated her in this as did the appellee's witnesses. He also stated that she did not prepare meals for him at times and she said that the only times she failed to do this were when she was ill or he had abused her. He testified that sometime in 1947 she threw a bowl of ice over his head in the presence of one of his friends. In the same year the parties attended a banquet at the Warwick Hotel and were accompanied by two of the appellant's employees and their wives and their son Blair and his wife. The appellant escorted the wife of one of his employees into the dining room and assumed that the appellee would be escorted by one of the other men. She came in later and scolded him for failing to escort her. In 1948 three men came to the home and appellant asked appellee to get a meal for them but she refused because there was nothing in the house except the remnants of a turkey. She suggested that the appellant take the three men out to eat but he refused and made sandwiches for them.

The parties quarreled often and the quarrels concerned money, where the appellant had been and why he was late for dinner. Each one started some of the arguments. Appellee called appellant vile and opprobrious names such as "Mr. All Bitch," "no God damn good," "big shot, big shit," "liar," "no good son-of-a-bitch," "God damn liar." On the other hand, the appellant admitted he called the appellee such names as "God damn son-of-a-bitch," "God damn liar," a "mean bugger," "no damn good," "a bitch" and "son-of-a-bitch." On one occasion he complains that she locked him out of his room in Asheville and on another occasion he complains that she called the police and asked them to make him stop beating her. On the night of January 4, 1952 the appellant arrived home at approximately 1:30 in the morning and when he entered the house his wife asked him if he had been out with his drunken friends again and she disturbed him by yelling at him and pounding on his door until 3:30. He then said: "This is as much as I can stand" and left at 7:30 that morning and took his chifforobe with him. He went to live in an apartment. The appellee, on the other hand, said she was worried about him, could not sleep and when he came in said to him, "John, where have you been? You had me worried to death." He then struck her and threw her across the bed. She further stated that she knocked on his door three or four times and said, "I want to get this thing straightened out." She then went to bed and was awakened by the noise of the men moving the chifforobe in the morning. The appellee testified that she made a good home for him, cooked his meals, did his laundry and entertained his friends. She testified that her husband struck her innumerable times and one witness corroborated her as to one occasion when appellant pounded his wife's head. She stated that he

beat her over the back with his fists in 1948 or 1949, that he kicked her in the leg, that he struck her in the face, twisted her nose, threw her across the bed in 1948 and broke her glasses, knocked her down, causing her to strike her head on the door frame and cutting her head, which left a scar which today extends from the hairline to near the nose bridge. He admitted that he put his hands on her shoulders and shook her as he had done before and that she crumpled to the floor and as she went down that caused the gash in her head. Appellant admitted that he locked her out of the house ten or twelve times a year for three years and that at times this was in the winter and she did not have time to get a coat to protect her from the cold. He admitted flipping a towel at his wife and striking her in the eye with it. She said the towel struck a blood vessel in the eye, which was sore for two weeks. He admitted pulling her down the steps at their shore cottage while she was carrying a suitcase upstairs. She testified that he took her by the ankles and pulled her down the steps while she had the suitcase in her hands, causing her to strike her chest. He admitted saying to her, "Who wants to bump into you all night," after which they occupied separate rooms. He admitted confining her to her room by tying the outside doorknob to the balustrade with a rope. He then left the house and did not know who released her. After three and a half hours of confinement, appellant's father came along and got a Frank Lyons to release her. The appellant admitted that in the summer of 1950, on their return trip from the shore, when they got to Fairmount Park, about two miles from home, after dark, he stopped the car and lifted her out of the car and put her on the grass. He then drove off and left her and did not send anyone for her. He admitted taking all the cash out of their joint safe deposit box, around $9,000.00, and

from July 1950 until an order for alimony pendente lite was entered in September 1952 he admits he gave her no money to run the house. He threw an electric light bulb which exploded on the floor in front of her, showering her leg with glass fragments, causing it to bleed. The appellee proved by a doctor that she had been going through the menopause since 1944. In March 1952, about three months after the separation, upon learning from her son that appellant was in a hospital, she phoned her husband and got permission to see him. As she was leaving him, she put her arms around him, kissed him and told him she would pray for him. He did not deny this. The following day she phoned her husband again and invited him to come home. He admitted that "She called and asked if I would come home for several days and rest and I said I would if it were pleasant. She said, 'You can't beat a woman up all the time and expect to be treated well.' I said, 'That is enough, I am not coming.'"

A decree in divorce must be supported by the presentation of clear and satisfactory evidence by the plaintiff. *McKrell v. McKrell*, 352 Pa. 173, 42 A. 2d 609.

"While we are not bound by his [the master's] conclusions as to credibility, his judgment upon that vital factor is entitled to the fullest consideration, as he has had the opportunity, not accorded to us, to observe the demeanor and appearance of the witnesses, which in many instances become 'the very touchstone of credibility'." *Oliver v. Oliver*, 172 Pa. Superior Ct. 600, 94 A. 2d 124.

". . . when the inanimate record as we read it discloses no sound basis for rejecting the master's conclusion founded upon his observation of demeanor and appearance, we are warranted in accepting his findings." *Smith v. Smith*, 157 Pa. Superior Ct. 582, 43 A. 2d 371.

The law does not recognize unusual conduct resulting from illness as a ground for divorce, *Crock v. Crock,* 96 Pa. Superior Ct. 377, 383, and ill health both explains and excuses a wife's conduct, and the acts of a spouse resulting from ill health do not furnish a ground for divorce. *Fawcett v. Fawcett,* 159 Pa. Superior Ct. 185, 48 A. 2d 23; *Stewart v. Stewart,* 171 Pa. Superior Ct. 218, 90 A. 2d 402.

In *Shilko v. Shilko,* 131 Pa. Superior Ct. 395, 397, 200 A. 127, a divorce was denied. The parties, as in this case, called each other names. We said, "This shows the style of language adopted by the parties themselves and does not indicate that the husband was of such a sensitive nature as to have his condition rendered intolerable by swearing."

What we said in *Coon v. Coon,* 173 Pa. Superior Ct. 60, 66, 95 A. 2d 344, is particularly applicable here: "The defendant was not entirely blameless. With some candor she admits 'some sort of a temper' and that 'she might have cursed a bit' on occasion. But the credible evidence does not manifest that hate and estrangement on her part toward her husband, which is essential to proof of indignities. McKrell v. McKrell, 352 Pa. 173, 182, 42 A. 2d 609. And the fact that the marriage is not a happy one is no ground for divorce. Stevenson v. Stevenson, 151 Pa. Superior Ct. 578, 30 A. 2d 675."

" '. . . where both parties are nearly equally at fault, so that neither can clearly be said to be "the injured and innocent spouse," the law will grant a divorce to neither, but will leave them where they put themselves; and if the alleged indignities were provoked by the complaining party, they are not grounds for divorce, "unless when the retaliation is excessive" . . . and that means, established to be excessive by clear and satisfactory evidence.' " *Oliver v. Oliver,* supra.

The order dismissing the complaint is affirmed.