Barnes *v.* Barnes, Appellant.

428

Argued April 11, 1956. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and CARR, JJ.

*Vincent P. Desmond,* for appellant.

*Robert W. Beatty,* with him *Butler, Beatty, Greer & Johnson,* for appellee.

OPINION BY RHODES, P. J., July 17, 1956:

The plaintiff, George J. Barnes, on March 20, 1952, filed his complaint in divorce in which he alleged that his wife had offered such indignities to his person as to render his condition intolerable and his life burdensome. After numerous and lengthy hearings the master recommended that a divorce be granted. The court below dismissed exceptions to the master's report on June 17, 1955, and entered a final decree dissolving the marriage on June 30, 1955. Agnes C. Barnes, the wife-defendant, has appealed to this Court.

The history of this marriage was told on behalf of plaintiff by himself and the older daughter of the parties, and on behalf of defendant by herself, her doctor, and two other witnesses. A rather unusual feature of this case is that much of the conduct of the wife is admitted, and that the same may be said as to some of the conduct of the husband. A question naturally arises as to cause, that is, who was essentially at fault in bringing about the situation. The burden was upon the husband as plantiff to establish by clear proof the imperious reasons for severing the marital relationship. *DeFrancesco v. DeFrancesco,* 179 Pa. Superior Ct. 106, 108, 115 A. 2d 411. It was also incumbent upon him to show clearly and indubitably his status as the injured and innocent spouse. *Gensemer v. Gensemer,* 176 Pa. Superior Ct. 508, 509, 108 A. 2d 834. A thorough examination of the record convinces us that these elements

of proof are lacking, and that the decree of the court below should be reversed.

The parties were married on June 17, 1932, in Philadelphia, and they began their married life together in the wife's room in a boarding house. At the time both parties were employed; the plaintiff worked as a deck hand on a tugboat, and defendant was an elevator operator. As their financial condition improved, the parties moved from place to place until, in 1941, they bought their own home in Drexel Hill, Delaware County. They lived there until plaintiff left his family in February, 1952. Two girls were born of the marriage; the older, aged 18 at the time of the hearing, lives with plaintiff, and the younger, aged 12, lives with defendant. In 1938 defendant suffered a nervous breakdown and since that time she has been under the care of Dr. N. W. Winkelman, a specialist in nervous and mental diseases, who testified in her defense. In addition to hospitalization for her mental condition, defendant has undergone numerous shock treatments; and in 1944 she had an operation for removal of a kidney, and a partial hysterectomy. Plaintiff, in his detailed and lengthy description of their married life, endeavored to demonstrate that its tranquillity was disturbed solely by the conduct of defendant. We shall briefly summarize his assertions, with defendant's denials and admissions thereto.

Plaintiff testified that defendant attempted to commit suicide on several occasions, one of which she admitted with the explanation that her husband had urged her to do so; that she was an extravagant spender, which she denied; that she cursed and used vulgar and profane language toward him in front of strangers and the children, some of which she frankly admitted as having done in the heat of argument and

in retaliation for plaintiff's abusive language, but she denied doing so in front of strangers and the children; that she made several attempts to kill plaintiff, which she denied, although she admitted that on one occasion she told plaintiff she would like to do so; that she threatened to picket plaintiff's place of employment because she felt that he was penurious, which she admitted in substance; that she told plaintiff she did not love him, which she admitted having said on one occasion while angry; that she read his mail, which she denied; that she tore a book that plaintiff was reading, which she admitted with the explanation that plaintiff had thrown the book at her in the first instance; that she accused him of infidelity and other improper sexual relations, which she denied in part and admitted in part as warranted by the facts; that she attacked him physically, which she denied except when acting in self-defense. However, plaintiff testified that he was never in fear of defendant.

On the other hand, plaintiff admitted that he reminded defendant of the bills for her medical care; that he used the word "imaginary" toward her "practically every day"; that he sang a song in her presence which inferred clearly that she was mentally unbalanced; and that one Christmas he brought home a derogatory novelty gift. He also admitted having used the word "stupid" to defendant on numerous occasions. On at least one occasion, when his wife protested his attentions to a woman who had moved into the neighborhood, he inflicted upon her a brutal assault which required her removal to a hospital. Although plaintiff denied any other assaults, he admitted actions which caused her physical injury. The daughter who testified in plaintiff's behalf stated that he used vile language toward defendant "once in awhile"; that he called de-

fendant "crazy"; and that he told defendant she was "imagining things."

A serious aggravation of their marital troubles occurred after 1946 when a Mr. and Mrs. Byrne moved into the neighborhood. Mr. Byrne's work kept him away from home to a considerable extent; and, although neighborly association began in the usual manner, the situation developed to the point where defendant insisted that plaintiff discontinue his association with Mrs. Byrne. Plaintiff emphatically refused to accede to this request. [1]

It was this association between plaintiff and Mrs. Byrne that largely caused the alleged abuse by defendant concerning which plaintiff complains. Plaintiff contended that his association with Mrs. Byrne was harmless and nothing more than neighborly friendship, and that he therefore felt the accusations of infidelity were unfounded. Defendant admitted that she never had seen plaintiff commit adultery but she stated that plaintiff had boasted of it to her. Defendant further testified that on two occasions she found plaintiff and Mrs. Byrne in positions of indiscreet familiarity; and that when she confronted plaintiff with these charges he told her they were just figments of her imagination.

It is evident from an incident concerning certain letters which the children of the parties found in the basement of their home that defendant had reason to believe that plaintiff's interest in Mrs. Byrne was more

---

[1] The master found as a fact:

"Defendant requested plaintiff to give up friendship with Mrs. Byrne, which plaintiff refused to do; . . ."

But the master's comment is difficult to reconcile:

"It does not seem likely that he would pursue a relationship, of which Mrs. Barnes was critical, openly, next door to his own home."

than one of ordinary neighborliness. The letters were sent by a man from Washington, D. C., to Mrs. Byrne, and they were apparently not in the best of taste or in proper language. When defendant confronted plaintiff with these letters he admitted having secured them from the home of Mrs. Byrne, but offered no explanation of his interest in the letters except the questionable manner in which they were taken. The natural effect of this episode was to further strengthen the aroused suspicions of defendant. At the hearings before the master, plaintiff gave no information other than that which he had given his wife. As a result of the finding of these letters of Mrs. Byrne and the discussion about the woman's ideas on the proper norms of morality, it is not surprising that defendant insisted that plaintiff and their children cease the association. Plaintiff, however, persisted in his refusal to do so, and said, according to defendant, that he would not allow anyone to pick his friends. The daughter who testified for plaintiff admitted that the trouble between her father and mother became acute on the finding of the letters, and that even she, as well as defendant, complained of plaintiff's conduct to Dr. Winkelman. Charges of infidelity do not constitute indignities when they are reasonably founded upon the suspicious actions of the husband. *Klimkosky v. Klimkosky,* 167 Pa. Superior Ct. 116, 119, 74 A. 2d 497; *Kranch v. Kranch,* 170 Pa. Superior Ct. 169, 172, 84 A. 2d 230.

In order that a divorce may be granted on the ground of indignities it must ordinarily appear that defendant has indicated, by a course of conduct, a settled hate and estrangement. *DeFrancesco v. DeFrancesco,* supra, 179 Pa. Superior Ct. 106, 111, 115 A. 2d 411. An essential element is the intentional conduct indicative of this attitude. Consequently, where a

wife's acts stem from mental illness the intent and malice are lacking, and such conduct will not support the granting of a divorce. *Albrecht v. Albrecht,* 176 Pa. Superior Ct. 626, 633, 109 A. 2d 209. ". . . conduct which springs from mental ill-health, whatever its nature or severity, should be regarded as unintentional and lacking the spirit of hate, estrangement, and malevolence, which is the heart of the charge of indignities." *Stewart v. Stewart,* 171 Pa. Superior Ct. 218, 221, 90 A. 2d 402, 403.

Plaintiff contends that the evidence does not indicate that defendant's conduct was the result of her illness, and he bases this contention on the fact that Dr. Winkelman did not explicitly so testify. Dr. Winkelman—a specialist in mental diseases since 1915, a professor in the Graduate School of the University of Pennsylvania, and the medical director of the Philadelphia Psychiatric Hospital—testified that defendant had been under his care since her nervous breakdown in 1938. He classified her illness as that of manic depressive psychosis, and described her condition as fluctuating between elation and depression, depending on the stimuli. She has a long history of hospitalization and shock treatment. In 1943 she was hospitalized for two months and in addition received outpatient shock treatments for a month in that year. In April and May of 1947 she also received shock treatments; and in June, 1947, she was hospitalized, and again received such treatments. It is to be noted that the year 1947 was that in which much of the difficulty over Mrs. Byrne occurred. Defendant was hospitalized again in 1949 for two months, and also in 1951 on two separate occasions of a month's duration each. Between the periods of hospitalization she received frequent treatments from Dr. Winkelman. Obviously de-

fendant is predisposed toward this illness, which is inherent in her personality. As Dr. Winkelman said, she has always had the "soil" of the disease. If it could be said that there was nothing more chargeable to plaintiff, his persistent association with Mrs. Byrne, the finding of the letters to Mrs. Byrne, and the assault by plaintiff adversely affected defendant's health, and had the "effect of precipitating her into depression, or an agitated depression." It was Dr. Winkelman's opinion that defendant's condition was aggravated by the "emotional problems at home." Since the separation in 1952, defendant has not been hospitalized, and at the time of the hearings her condition was greatly improved. See *Clark v. Clark*, 160 Pa. Superior Ct. 562, 565, 52 A. 2d 351. We fail to see that there was any necessity, in view of this testimony as to defendant's condition, that Dr. Winkelman more explicitly state that defendant's conduct was the result of her illness. We think it arises logically as an inference therefrom. At least, the conduct of plaintiff was sufficient to aggravate her condition and create a state of emotional depression, and it would be inconsistent to say that her acts at that time were not also caused by or related to her illness. Moreover, assuming that plaintiff's conduct was as harmless as he contends, which we do not believe, the extreme reaction of defendant to this allegedly innocent stimuli sufficiently indicates that she acted under the burden of her illness; and the very excess of defendant's conduct at the time of her emotional depression would thus establish its non volition.

In an effort to relieve himself of any stigma of fault concerning defendant's condition, plaintiff testified to certain visits which he made to Dr. Winkelman and to the conversations which they had. Without objection he testified: ". . . I have asked him am I at fault for Mrs. Barnes' breakdown and he has told me directly,

no, I am not at fault, it is not my fault, that regardless of who Mrs. Barnes lived with or was married to, she would still find fault and still be that way under any circumstances." Certainly plaintiff understood the nature of defendant's condition and that her actions, including attempts at suicide, were attributable thereto. He cannot now successfully take advantage of any such alleged technical defect in the evidence of defendant. By his own testimony he has supplied the connection if such were necessary. We have no hesitancy in concluding that the illness of defendant, if not the sole cause of her conduct, contributed in large measure to bring it about and was responsible for the extremes to which that conduct may have gone at times. See *Glass v. Glass,* 164 Pa. Superior Ct. 118, 122, 63 A. 2d 696. A fundamental error of both the master and the court below was the exclusion of any consideration of defendant's mental illness on the assumption that more specific testimony by Dr. Winkelman as to cause and effect was an indispensable requisite. See *Fawcett v. Fawcett,* 159 Pa. Superior Ct. 185, 189, 48 A. 2d 23; *Moyer v. Moyer,* 181 Pa. Superior Ct. 400, 124 A. 2d 632.

Furthermore, we believe that plaintiff clearly provoked much of the conduct of defendant upon which he bases his complaint. As we have indicated, he was well aware of defendant's mental and emotional instability; nevertheless he acted without regard to it and in fact wilfully aggravated her condition. While under ordinary circumstances and normal conditions the conduct of defendant might support a decree in divorce, it will not do so here. "Indignities provoked by the plaintiff are not ground for divorce unless the retaliation was excessive." *McGuigan v. McGuigan,* 178 Pa. Superior Ct. 176, 181, 112 A. 2d 440, 442. We cannot say, under the circumstances of defendant's mental condition, that

any retaliation was excessive and thus ground for divorce. "There is a manifest and very substantial difference between a course of conduct consisting of false, malicious, abusive, humiliating and insulting accusations persistently, continuously, and without provocation addressed by the respondent to the libelant, and the scolding and fault-finding attributable to irritability caused by disease or nervous disorder, . . . " *Schulze v. Schulze,* 33 Pa. Superior Ct. 325, 330.

Plaintiff's cause was not aided by the fact that the older daughter testified in his behalf. She was living with plaintiff (*Castner v. Castner,* 159 Pa. Superior Ct. 387, 389, 48 A. 2d 117), and she admitted having inflicted physical injuries on her mother. Her attempts to minimize the conduct of plaintiff while magnifying the acts of defendant are quite obvious. Moreover, this witness admitted having talked with defendant in an effort to convince her not to contest the divorce action. As we view it the testimony of this witness tends to support defendant's assertions rather than those of plaintiff.

We are not inclined to comment on the failure of a witness to testify in a divorce case, but the absence of Mrs. Byrne as a witness seems significant. Plaintiff and the daughter admitted that much of the family discord began with the association of plaintiff and Mrs. Byrne, while defendant's implications in this respect were clear. We can understand the reluctance of Mrs. Byrne to testify, but her absence, which is unexplained, cannot be ignored. *Gensemer v. Gensemer,* supra, 176 Pa. Superior Ct. 508, 512, 108 A. 2d 834; *Dash v. Dash,* 357 Pa. 125, 129, 130, 53 A. 2d 89.

The report of the master, who saw and heard the witnesses, is ordinarily entitled to the fullest consideration, especially where credibility is the ultimate issue.

*Silfies v. Silfies,* 168 Pa. Superior Ct. 421, 423, 79 A. 2d 130; *Rankin v. Rankin,* 181 Pa. Superior Ct. 414, 124 A. 2d 639. The instant case, however, does not depend on whether one or the other of the parties is to be believed. Rather, it is a matter of proper interpretation of the accepted essential facts and the inferences which are to be drawn therefrom. See *Politylo v. Politylo,* 173 Pa. Superior Ct. 223, 229, 95 A. 2d 241. It is our conclusion that the conduct of defendant has been adequately explained not only by her own testimony and that of her witnesses, but also by the testimony of plaintiff and the daughter as well. It follows that no legal cause of divorce was established.

The decree of the court below is reversed, and the complaint in divorce is dismissed at plaintiff's cost.