## Moyer *v.* Moyer, Appellant.

Argued March 23, 1956. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and CARR, JJ.

*Emanuel H. Klein*, for appellant.

*Claire G. Biehm*, for appellee.

Opinion by Wright, J., July 17, 1956:

On April 20, 1951, Stanley M. Moyer instituted an action in divorce against his wife, Dorothy F. Moyer, charging indignities to the person. After disposing of rules for a bill of particulars and for counsel fee and alimony pendente lite, the lower court, on December 27, 1951, appointed a master. Twenty-two hearings were held in all, the last thereof being on July 13, 1953. The record contains 2134 pages. On August 13, 1954, the master filed his report recommending a divorce. Following the filing of exceptions and argument thereon, the lower court approved the recommendations of the master and, on September 2, 1955, entered a final decree. This appeal followed.

The husband was born in 1906 and the wife in 1910. They were married on September 7, 1932. The husband is a physician and has been practicing medicine continuously since the marriage. There are four children, two girls and two boys, all of whom were living with the parties during their marriage and at the time of the hearings, except that the elder daughter was attending a nurses training school. In 1940 the parties purchased a home at 519 Juniper Street, Quakertown, as tenants by the entireties, wherein they have resided ever since. The wife contributed her inheritance toward the purchase price. The husband has offices on the first floor of a portion of the dwelling. These offices are separate from the living quarters and have a separate entrance from the exterior. The husband makes no complaint of his wife's conduct prior to 1941, nor could he well do so. The wife worked extremely hard taking care of the offices, the dwelling quarters, and the children. She regularly cleaned the offices, even to the extent of scrubbing the floors. She did all the washing and ironing. She also made clothes

for the children and for herself. In addition, she assisted her husband in his practice by taking telephone calls and greeting his patients. The husband did not give his wife an allowance for food or clothing, nor an allowance for her own personal needs. This was a very sore point and caused frequent arguments. The wife was reduced to asking her husband every time she needed money for her daily household needs or for her personal use. Although the wife wanted to go out socially with her husband, he rarely joined with his wife in social activities. He objected to his wife's smoking and taking a sociable drink, giving vent to frequent tirades on that subject, as well as the subject of his wife's housekeeping. For instance, while taking his wife to the hospital to be delivered of the third child, the husband told her she was not fit to have children, and that some day she would find out how much he despised her. As a result of the husband's conduct, the wife suffered from severe migraine headaches.

According to the bill of particulars, the husband's complaints concerning his wife's conduct commence with the year 1941. During that year the wife visited her aunt in Canada. On the return trip by train, the wife met a Canadian sailor who was identified at the hearing as a Mr. Roberts. Upon her return home she corresponded with Roberts, which correspondence ceased at the husband's request. The wife found nothing wrong in what she had done and strongly resented her husband's attitude. It should be here noted that the master states, not only with respect to this incident but also with respect to all the subsequent incidents which will be hereafter mentioned, "There is nothing in the record to indicate any adulterous relationship on the part of the defendant, and the master neither states or implies that the defendant was guilty of such

misconduct". The wife's headaches were so aggravated by her husband's criticism and the ensuing disputes that, in 1942, she attempted to commit suicide by taking an overdose of sleeping pills. The parties were thereafter reconciled.

In June 1942, the husband entered the military service of the United States. On July 10, 1943, he was assigned to duty in India. He returned to the United States in March 1945. Before leaving for overseas the husband made the unusual request that his wife write to him and reveal the details of any occasion which she spent in the presence of another man. Several of the incidents complained of in the bill of particulars were mentioned in the letters which the wife wrote to her husband every day. They are summarized in the opinion of the lower court as follows:

"The Defendant attended a radio program in Philadelphia and there met a Chief Petty Officer. After some conversation with him, the Defendant invited him to dinner. Subsequently, the officer accepted the invitation, had dinner with the Defendant at her home, and spent the night at the home of the Plaintiff's father, who was also a physician in the Borough of Quakertown. The Defendant told her husband that during the course of the evening the officer had made advances and indecent suggestions which she had resisted.

"On New Year's Eve, that is, the evening of December 31, 1943, the Defendant and a female companion went to the City of Philadelphia and there attempted to enter a tavern or night club, whereupon they were told by the doorman that ladies were not admitted without escorts. Two servicemen, having overheard this statement, asked whether they might serve as such escorts and the Defendant and her companion agreed. Observing that the bar was crowded, they went to the

hotel room of the servicemen at the Defendant's suggestion, where they each drank a highball or two, and then returned to the establishment they had previously visited where they remained until after midnight. Mrs. Moyer says she then parted company with the men and that she and her companion visited Mrs. Moyer's sister in Philadelphia.

"In January of 1944, the Defendant visited a Post of the Veterans of Foreign Wars near her home, where she met a 'medic.' Upon leaving the establishment, they found that the last trolley to Quakertown had left, whereupon they obtained a 'hop' to Quakertown. Upon learning, or having previously known, that the 'medic's' home was in Bethlehem and that it would be difficult for him to reach his home at that hour, Defendant invited the 'medic' to stay at her home, which he did, sleeping on the davenport.

"Early in 1944, the Defendant obtained employment as a waitress at Trainer's Restaurant near Quakertown. There she met a Mr. Honiwell, a truck driver for the Bond Baking Company. On at least two occasions, the Defendant met Honiwell late at night, he taking her to her home in the truck of the Bond Baking Company. When the Defendant spent the summer of 1944 at the seashore with the children, Honiwell drove the truck which transported the family and their supplies to the resort."

When the husband arrived home from overseas duty, arguments took place regarding these incidents. After one of the more heated discussions, the wife again attempted to commit suicide by taking a large amount of sulphathiazole. Upon the wife's return from the hospital the husband told her that he was going to be a real husband and show her the love and affection she needed, and that he realized that he was as much

at fault as she in any troubles they had in their marriage. A reconciliation was again effected. It is significant that the husband advances no complaints about the wife's conduct from 1945 until 1949, a period of four years.

During the husband's absence in the service the wife's migraine headaches ceased. Upon the husband's return home the wife's headaches began again and, throughout the ensuing years, they have increased in frequency and severity. At a medical convention which the parties attended, the wife consulted a Dr. Sullivan who was allegedly an authority on the subject. This doctor suggested that both the husband and wife should consult a psychiatrist. The husband had been giving his wife injections of gynergen. At this same convention the wife discovered that she could take gynergen in tablet form. The wife eventually consulted a Dr. Hoffman in Allentown and this doctor suggested that the husband talk with him, but the husband refused to do so. He took the position that his wife did not need psychiatric help, yet warned the wife that continuous use of gynergen was dangerous. It appears that the wife was operated upon by a Dr. Kratzer for hemorrhoids. Dr. Kratzer also recommended psychiatric treatment for the migraine headaches, which treatment the husband refused to provide.

Commencing in the summer of 1949, the wife began accusing her husband of infidelity. She testified, inter alia, that contraceptives disappeared from their bedroom, that there were telephone calls from women, which calls were abruptly terminated when she answered the telephone, and that on several occasions the husband's underwear was soiled. She showed to the husband an anonymous letter in which it was stated that he was having an affair with another woman. She

subsequently admitted that she had asked her sister to write this letter.

About this same time, the parties became acquainted with Charles Beatty and his wife. The two families visited each other. In March 1950 the husband learned that his wife was seeing Beatty frequently and had taken trips to Delaware to the home where the Beattys were then living. The parties had discussions of this matter in the presence of the husband's father and brother. There was testimony that the wife said that she was in love with Beatty, and that she had made such a statement to persons outside the family. The wife either denied these conversations or placed a different interpretation upon them. A reconciliation was again effected and the parties took two weekend trips to New York City. Following the second trip the husband again brought up the Beatty matter. Further quarrels ensued which upset the wife emotionally and aggravated her migraine headaches. The husband set midnight as the curfew hour for his wife to retire. In June 1950 when the wife waited up for her daughter to return from the high school junior prom, the husband accused the wife of sneaking in and out of the house and of being out with another man. This caused such a heated argument that the wife did not sleep with her husband that night and has not returned to his bed since.

Following the close of the school year in June 1950, the parties had a discussion concerning a trip which the wife wished to take to Minnesota after the two daughters had returned from a visit with the wife's brother in North Carolina. The wife's aunt was employed in the school system at Minneapolis, her special field being psychology and psychiatry. According to the wife, "Then came a week of hell". The husband

constantly berated her, said that she wasn't fit to be a wife or mother, suggested that she move out, and said that he and the children "would be better off with you dead". Without informing her husband, the wife left for Minnesota early one morning. The husband then wired the wife's brother to bring the girls home. Upon his arrival, the brother had a conversation with the husband and the husband's father. The husband admitted that his wife was a fine mother, that he had not treated her properly, and said that he would try to do better.

While in Minnesota, the wife was examined by a Dr. Miller, who recommended immediate psychiatric treatment as well as a complete hospital study. Upon her return, the wife reported Dr. Miller's recommendation to her husband but he displayed no interest. He said to the wife, "I am running this family now. You have absolutely nothing to say. You are finished. You clear out of here. From now on you are done. You might just as well be dead". He changed all of his insurance policies, completely excluding the wife, and explained that he had been forced to take such action because the wife "had become so mentally unstable". He suggested that the wife needed commitment to a mental institution.

The wife was given a basal metabolism test by a Dr. Peters who found nothing organically wrong, but also recommended psychiatry. The wife finally consulted a Dr. Haimes in Allentown. Upon learning of this, the husband called the wife a neurotic and a malingerer. He refused to provide hospitalization for clinical study. The wife then was examined by Dr. Eads, who made recommendations almost identical to those of Dr. Miller. The husband stated that he was not interested in the opinion of Dr. Eads. However,

in October 1950, the wife did enter Jefferson Hospital as the patient of Dr. Eads. She paid the hospital bill by cashing in a small life insurance policy which her mother had taken out. Upon her return from the hospital the wife reported to her husband that it was the opinion of Dr. Eads that her migraine headaches were entirely psychosomatic. At the time of the hearings, the wife was still undergoing treatment by Dr. Haimes.

It should be emphasized that, following the commencement of the divorce action, the parties continued to live with their children in the joint home. They were still living together at the time of oral argument, which amounts to a period of five years. During all this time the divorce proceeding was in progress. The wife prepares the meals, and she and her husband eat at the same table. The wife does the husband's laundry and mends his clothing. She continues to answer the telephone and to greet her husband's patients. She does the buying, including her husband's underwear and socks. The parties even watch television together. In fact, until stopped as the result of a complaint by the wife to her attorney and by him relayed to the husband's attorney, the husband would enter the bathroom while the wife was using it. In short, life in the Moyer home goes on as it always did, even better according to the wife, except for the fact that the parties occupy separate bedrooms.

The Commonwealth is a party to all divorce proceedings, and a decree of divorce must be founded upon compelling reasons, and upon evidence that is clear and convincing: *Wasson v. Wasson*, 176 Pa. Superior Ct. 534, 108 A. 2d 836. After a time-consuming consideration of the voluminous record in this case, we have reached the firm and settled conviction that the husband has not made out a case by that clear and

satisfactory evidence which is necessary to a decree in divorce. See *Danniballe v. Danniballe,* 177 Pa. Superior Ct. 334, 110 A. 2d 854. Our conclusion is supported by four controlling legal principles which we will discuss in the light of the evidence, but not necessarily in the order of their importance.

To support a charge of indignities there must be evidence from which an inference of settled hate and estrangement may be deduced: *Politylo v. Politylo,* 173 Pa. Superior Ct. 223, 95 A. 2d 241. And see *Carter v. Carter,* 166 Pa. Superior Ct. 499, 72 A. 2d 621. The mere fact that the parties do not get along well together will not suffice. *DeFrancesco v. DeFrancesco,* 179 Pa. Superior Ct. 106, 115 A. 2d 411. In the case at bar, the husband relies primarily upon incidents which he contends constitute improper association with other men, and secondarily upon the wife's false accusations of his infidelity. Passing appellant's argument that nonconformity is not an indignity, the record nowhere indicates that the wife acted in a spirit of malevolence. The element of a settled hate and estrangement in connection with her conduct is not present. See *Glass v. Glass,* 164 Pa. Superior Ct. 118, 63 A. 2d 696. We find no malice in the wife's brief association with Mr. Roberts or in her associations with men while her husband was in the service. The husband does not contend that the wife was unfaithful and, as previously noted, the master does not state or even imply that there was any immoral conduct. The Beatty association is in the same category. The most that can be said of it is that it was indiscreet. The wife terminated this association after gossip arose. The parties were thereafter reconciled. So far as the accusations of infidelity are concerned, they were based, at least in the mind of the emotionally disturbed wife,

upon sufficient provocation. See *Boyles v. Boyles,* 179 Pa. Superior Ct. 184, 116 A. 2d 248; *Soper v. Soper,* 178 Pa. Superior Ct. 182, 112 A. 2d 420.

In a proceeding for divorce on the grounds of indignities, it must clearly appear from the evidence that the plaintiff was the injured and innocent spouse: *Matovcik v. Matovcik,* 173 Pa. Superior Ct. 267, 98 A. 2d 238. Many pages of the record are devoted to the wife's testimony in which she accuses the husband of being penurious, without affection, and without sympathy for her physical discomfort. As heretofore noted, the husband went into tirades concerning his wife's smoking, drinking, alleged indiscretions, and poor housekeeping. In fact, the lower court stated that it did "not find the plaintiff entirely without fault in his attitude toward his wife". The record indicates that the husband considered his wife an inferior not an equal. It was her duty to prepare the meals, raise the children, do the laundry, clean the house, and satisfy her husband's sexual needs. All of the finances were handled by the husband. He forced the wife to beg for any money she needed. He rarely kissed her, and did not even address her by her first name. Above all, he failed to provide the psychiatric treatment which was recommended, which he as a physician should have realized that his wife needed, and which the master found was required. In some respects the husband appears in a light similar to the plaintiff in *Ritrovato v. Ritrovato,* 167 Pa. Superior Ct. 111, 74 A. 2d 504, wherein we held that the plaintiff was not an injured and innocent spouse. See also *McGuigan v. McGuigan,* 178 Pa. Superior Ct. 176, 112 A. 2d 440; *Jacobson v. Jacobson,* 154 Pa. Superior Ct. 449, 36 A. 2d 189; *Hunter v. Hunter,* 169 Pa. Superior Ct. 498, 83 A. 2d 401; *Gensemer v. Gensemer,* 176 Pa. Superior Ct. 508, 108 A. 2d 834.

The Divorce Law expressly requires that, in order to constitute indignities to the person of the injured and innocent spouse, the acts charged must render his condition intolerable and his life burdensome. Act of May 2, 1929, P. L. 1237, Section 10, 23 PS 10. Unless this consequence is shown to follow from the conduct about which complaint is made, the alleged indignities are insufficient in gravity to amount to cause for divorce. See *Benny v. Benny,* 167 Pa. Superior Ct. 227, 74 A. 2d 782. While reconciliation is not a complete defense to an action in divorce on the ground of indignities, it is a factor for consideration in evaluating the severity of the conduct: *Hahne v. Hahne,* 168 Pa. Superior Ct. 324, 77 A. 2d 682. See also *Mathias v. Mathias,* 114 Pa. Superior Ct. 444, 174 A. 821. In the case at bar, every argument except the last, which was clearly unjustified on the husband's part, was followed by a reconciliation. From 1945 to 1949 the period of reconciliation lasted four years. See *Esenwein v. Esenwein,* 312 Pa. 77, 167 A. 350. Furthermore, the fact that the parties are still living together in the common home is significant: *Blose v. Blose,* 163 Pa. Superior Ct. 322, 61 A. 2d 370. It is also a factor which must be taken into consideration: *Cunningham v. Cunningham,* 119 Pa. Superior Ct. 380, 181 A. 458. The court below states that "the plaintiff was ill-advised to remain in the common domicile". The evidence in this record warrants a much stronger statement. Our view is that the continued living arrangements, heretofore detailed, conclusively establish that the wife's conduct did not render the husband's condition intolerable and his life burdensome.

Finally, our review of this record demonstrates that the wife in the case at bar is not a well woman. The parties in a marriage take each other for better or for

worse, in sickness and in health. While this feature of the case is discussed to a limited extent by the master, it is not mentioned in the opinion of the court below. The law does not recognize conduct resulting from illness as a ground for divorce: *Crock v. Crock,* 96 Pa. Superior Ct. 377. The implication throughout the testimony in the case at bar is that the conduct of the wife, especially in the later years, should be excused because of her condition. It is only necessary to refer to her two attempts at suicide, to her constant treatment by the husband and his father, a physician now deceased of whom the wife spoke with the greatest affection, and to the examinations and recommendations of the seven other doctors heretofore mentioned. These circumstances cannot be blindly disregarded. In the words of our colleague, Judge ERVIN, in *Albrecht v. Albrecht,* 176 Pa. Superior Ct. 626, 109 A. 2d 209, "ill health both explains and excuses a wife's conduct, and the acts of a spouse resulting from ill health do not furnish a ground for divorce". And see *Stinson v. Stinson,* 163 Pa. Superior Ct. 497, 63 A. 2d 413; *Stewart v. Stewart,* 171 Pa. Superior Ct. 218, 90 A. 2d 402. "The cardinal error of the court below was the failure to take into the account respondent's physical and mental ailments, and for that reason, among others, the record will not support a decree": *Fawcett v. Fawcett,* 159 Pa. Superior Ct. 185, 48 A. 2d 23.

The decree of the court below is reversed, and the complaint in divorce is dismissed.

WOODSIDE, J., dissents.