## Braun, Appellant, *v.* Braun.

Argued March 18, 1958. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

*Harry D. Sporkin,* with him *Jacob B. Abrams,* for appellant.

*David E. Pinsky,* with him *David J. Salaman,* for appellees.

OPINION BY HIRT, J., June 11, 1958:

In his complaint filed in December 1952 the plaintiff, as grounds for divorce, charged cruel and barbarous treatment, and indignities to his person. The action was vigorously defended on behalf of the respondent wife at the numerous and extended hearings before the master. The master filed his first report on December 14, 1954 in which he recommended a decree of divorce on the ground of indignities. Exceptions were filed by defendant's counsel and while they were pending the defendant's father petitioned to intervene in the action on behalf of his daughter alleging that she was suffering from a mental disorder and for that reason was incapable of further defending the action. Thereupon the court referred the case back to the master for specific findings as to the defendant's mental condition. Notwithstanding the testimony of two qualified neuro-psychiatrists to the contrary, the master in his supplemental report found the defendant chargeable with responsibility for her conduct and again recommended a divorce for indignities. The

lower court however sustained the defendant's exceptions to the supplemental report of the master and on October 24, 1956 dismissed the complaint; this disposition of the case was affirmed, after argument and reargument on plaintiff's motion, in the final order entered on May 1, 1957 from which the plaintiff appealed.

The parties had been friends for a number of years when they were married on June 24, 1944. But the plaintiff did not know that defendant had been a patient in a hospital for mental and nervous disease for two and one-half months in 1936. Her condition at that time was diagnosed as dementia praecox although there is no evidence that she was informed of the fact; for that reason, perhaps, she did not inform plaintiff of the hospitalization before marrying him. After the marriage they lived in the home of plaintiff's mother who ran the household. From 1944 until 1951 the union apparently was a normally happy one, with only one untoward occurrence which took place when defendant, in the latter stages of her first pregnancy and after a dispute with plaintiff's mother, left plaintiff and returned to the home of her parents. We agree with this comment of Judge Lewis on this incident: "The testimony as to the responsibility of either party for this separation is inconclusive, and, though we accept plaintiff's version, it must be considered an isolated incident not forming part of a pattern of conduct as encompassed by the charge of indignities." During the period from 1951 to January 1953 there is testimony, and it for the most part is uncontradicted, of a succession of bizarre, incongruous, irrational and at times violent acts which are almost completely out of character of the wife of the first years. During the period the circumstances, under which she again left her husband and went to her parents to live, do not justify the frequent separations. From an examination

of the entire record in this case the conclusion is inescapable that if the defendant's conduct was volitional or within her control, the resulting indignities suffered by plaintiff were clearly sufficient to entitle him to a divorce.   Our independent judgment, however, based upon all of the testimony coincides with that of Judge LEWIS of the court below.   We are convinced that because of a most serious mental disease she is not to be charged with responsibility for her abnormal conduct.   For that reason this record may be spared a recital of the acts upon which plaintiff relies, as unseemly and immaterial under the circumstances.

The plaintiff testified that in 1951 he first noted that "she just didn't act right."   Nevertheless despite this circumstance and the fact that defendant's bizarre conduct, from 1951 on, should have confirmed his suspicion that she was in need of medical care, plaintiff did nothing about it.   He did not provide the services of a psychiatrist for either diagnosis or treatment. Defendant's father testified that his daughter behaved in a highly abnormal manner as early as September 1951 and that she became violent in 1952.   A neighbor and an aunt of the defendant similarly characterized her conduct as violent and strange behavior.   Early in January 1953, through the combined efforts of the plaintiff and the defendant's father, she was admitted to Friends Hospital for Mental and Nervous Diseases where she was confined for about four months.   She was pregnant at the time and on March 17, 1953 was transferred to the psychiatric ward of Philadelphia General Hospital because of lack of facilities for maternity cases at Friends Hospital.   She was discharged from Philadelphia General Hospital in July 1953 with her mental illness apparently in remission at that time.

Dr. Nicholas G. Frignito was the only psychiatric expert who testified at any of the hearings before the

master prior to the remand. At the hearing of August 26, 1954 Dr. Frignito was called as a witness on behalf of the defendant. He is a neuro-psychiatrist of long experience and high standing in his profession. He examined the defendant for the first time on January 29, 1953. On that occasion he was one of the physicians upon whose commitment she was admitted to the Friends Hospital. His examination demonstrated to him that she then was suffering from "schizophrenia, or dementia praecox of a paranoid type" and that was the subsequent diagnosis of the physicians at Friends Hospital. On May 20, 1953, the diagnosis at Philadelphia General Hospital was "Chronic schizophrenia". Dr. Frignito testified at length and was subjected to a thorough cross-examination. Based upon his examination of the defendant and the history of her past mental illness in 1936 and her behavior throughout the period Dr. Frignito's opinion may be stated in these excerpts from his testimony: "My feeling would be if these incidents occurred from April of 1952 up until January of 1953, when I examined her, most of her acts of disagreement with her husband and maladjustment would be the result of her mental disease or psychosis . . . From the evidence presented here there is no doubt but that the psychosis started long before January, 1953, when I saw her. This girl is a real schizophrenic, and there is no doubt about it. [She] has been a psychotic person for a long time."

At the time of argument on the exceptions to the master's report the court remanded the case to the master for the purpose of taking further testimony "as to the defendant's mental state and to report further, with his findings." Dr. Maurice E. Linden, a neuro-psychiatrist admittedly "eminent in his profession" was called as a witness on behalf of the defendant. He made an examination of the defendant shortly before the hear-

ing; he had never seen her before that time. From this examination and from an inspection of the copious records of the two hospitals where she had been committed, and in response to a hypothetical question, he also gave it as his opinion that she suffered from schizophrenia of the paranoid type. He testified that the incidents which occurred in 1951, in April 1952 and in July 1952, in August 1952 and November 1952, were not isolated abnormal incidents but that "they are all of a pattern" and that in these acts "she was driven by impulses beyond her control to which she responded in those acts." It was the contention of plaintiff that the defendant's mental illness was in a period of remission and that the acts of indignities complained of were her voluntary conscious acts. Dr. Linden testified that while there was no evidence of clear cut delusions which go with an acute personality psychosis, yet from defendant's lack of orderly processes of thought and looseness of thinking, in his opinion, there was only a partial remission of her mental disorder at any time when she committed the acts complained of. He used the term "remission" not as "cure" but rather as an improvement merely in symptoms. In summary he testified: "those acts taken singly, are not diagnostic of an emotional disorder, but taken together with the history of psychosis, with the knowledge that we have at the present time, there is no question in my mind that she was in some state of psychosis." And referring to the indignities complained of the the witness stated: *"I think she was driven by impulses beyond her control, to which she responded by those acts."* He in part stated: "I think that those moments of flare-ups were moments of intense psychosis . . . There are some acts there that I know of no normal woman perpetrating." "Q. Can you make any particular reference in this case itself as to when this disease came back again.

A. . . . I believe that in 1950 or thereabouts there was again a re-exacerbation [i.e. increase in violence] of the pathological defenses of the kind, which taken together, are psychoses. Q. You mean by psychoses what? A. Mental illness . . ."

The applicable principles are, without question, settled law. A plaintiff who seeks to sever a marital bond on the ground of indignities has the burden of proving a volitional course of conduct which renders his condition intolerable and life burdensome. In *Barnes v. Barnes,* 181 Pa. Superior Ct. 427, 433, 124 A. 2d 646, we said: "In order that a divorce may be granted on the ground of indignities it must ordinarily appear that defendant has indicated, by a course of conduct, a settled hate and estrangement. DeFrancesco v. DeFrancesco, supra, 179 Pa. Superior Ct. 106, 111, 115, A. 2d 411. An essential element is the intentional conduct indicative of this attitude. Consequently, where a wife's acts stem from mental illness the intent and malice are lacking, and such conduct will not support the granting of a divorce. Albrecht v. Albrecht, 176 Pa. Superior Ct. 626, 633, 109 A. 2d 209. '. . . conduct which springs from mental ill-health, whatever its nature or severity, should be regarded as unintentional and lacking the spirit of hate, estrangement, and malevolence, which is the heart of the charge of indignities' ". Unusual conduct resulting from illness is not ground for divorce. *Crock v. Crock,* 96 Pa. Superior Ct. 377. Indignities committed by a wife are excused to the extent that her conduct is involuntarily induced by her physical condition. *Duchossois v. Duchossois,* 139 Pa. Superior Ct. 1, 10 A. 2d 824; *Fawcett v. Fawcett,* 159 Pa. Superior Ct. 185, 48 A. 2d 23; *Moyer v. Moyer,* 181 Pa. Superior Ct. 400, 124 A. 2d 632. So also indignities which are the product of emotional instability attributable to a "well known form of insanity" (in that

case manic-depressive psychosis) are not ground for divorce. *Benjeski v. Benjeski,* 150 Pa. Superior Ct. 57, 27 A. 2d 266. In *Castner v. Castner,* 159 Pa. Superior Ct. 387, 48 A. 2d 117, we recognized that a husband was not entitled to a divorce upon indignities where the wife "was suffering from a severe nervous condition" [less than insanity] and for that reason was "unstable and irresponsible for her conduct". The same result was reached in *Stewart v. Stewart,* 171 Pa. Superior Ct. 218, 90 A. 2d 402, where the wife "manifested certain behavior . . . interpretable as . . . pre-psychotic." On the facts there presented we held : "The conclusion must be that, although defendant is not insane, she is and has been, throughout the greater part of her married life, definitely mentally deranged." On that ground the decree dismissing the husband's complaint was affirmed. Cf. *Schwarzkopf v. Schwarzkopf,* 176 Pa. Superior Ct. 441, 107 A. 2d 610; *McElroy v. McElroy,* 185 Pa. Superior Ct. 78, 138 A. 2d 299. In the application of these principles to the testimony in this case, the plaintiff clearly has failed to meet his burden of proof.

The wife in the present case suffered from schizophrenia of the paranoid type, also referred to as dementia praecox. This is a most serious mental disorder. Not only acts of indignity but even tragedy not uncommonly result from the involuntary acts of such paranoiacs. There is a difference of medical opinion on the question as to whether a permanent cure may be possible in such cases. Remission of the symptoms to a greater or less degree may be all that may be hoped for. Under the testimony in this case the wife at best was in a state of only partial remission and never so free from her psychosis as to charge her with legal responsibility for her abnormal acts.

Decree affirmed.